Earl Benjamin BUSH et al., Plaintiffs,

v.

ORLEANS PARISH SCHOOL BOARD et al., Defendants.

Harry K. WILLIAMS et al., Plaintiffs,

v.

Jimmie H. DAVIS, Governor of the State of Louisiana et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

STATE OF LOUISIANA et al., Defendants.

Civ. A. Nos. 3630, 10329, 10566.

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 30, 1960

Thurgood Marshall, New York City, A. P. Tureaud, A. M. Trudeau, Jr., Ernest M. Morial, New Orleans, La., for plaintiffs, Earl Benjamin Bush and others.

Charles E. Richards, New Orleans, La., for plaintiffs, Harry K. Williams and others.

M. Hepburn Many, U. S. Atty., Prim B. Smith, Jr., Asst. U. S. Atty., New Orleans, La., Gerald P. Choppin, Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff, the United States.

Samuel I. Rosenberg, Peter H. Beer, William Campbell, Jr., George Denegre, William B. Dreux, James H. Drury, Lucien M. Gex, Jr., William J. Guste, Jr., Victor H. Hess, Jr., W. Ford Reese, John E. Hurley, Ralph N. Jackson, Walter J. Landry, Joseph McCloskey, J. Thomas Nelson, John P. Nelson, Jr., Ashton Phelps, Robert G. Polack, Ivor A. Trapolin, Beryl E. Wolfson, New Orleans, La., for Orleans Parish School Bd., Bd. Members Lloyd Rittiner, Louis G. Riecke, Matthew R. Sutherland and Theodore H. Shepherd, Jr., and Dr. James F. Redmond, Superintendent of Orleans Parish Schools.

Jack P. F. Gremillion, Louisiana Atty. Gen., Michael E. Culligan, John E. Jackson, Jr., William P. Schuler, Weldon Cousins and Jack Brittain, Asst. Attys. Gen., Richard Dowling, Orleans Parish Dist. Atty., New Orleans, La., for Jack P. F. Gremillion as Louisiana Atty. Gen., A. P. Tugwell as State Treasurer, Shelby M. Jackson as State Superintendent of Ed., Members of the State Bd. of Ed., Colonel Murphy J. Roden as State Director of Public Safety, Major General Raymond H. Flemming as State Adjutant General, Roy H. Theriot as State Comptroller, Bryan Clemmons as Sheriff of East Baton Rouge Parish, John Christian as Mayor of Baton Rouge, and Shirley S. Arrighi as Chief of the Baton Rouge Police Dept.

W. Scott Wilkinson, Shreveport, La., Thompson L. Clarke, Gibson Tucker, Jr.,

Russell J. Schonekas, New Orleans, La., for Edward LeBreton and Seven Others Constituting the Committee of Eight of the Legislature of Louisiana, and for Emile A. Wagner, Jr., Member of the Orleans Parish School Bd.

Alvin J. Liska, New Orleans City Attorney, Joseph Hurndon, Asst. City Atty., Ernest L. Salatich, Asst. City Atty., David MacHauer, Asst. City Atty., New Orleans, La., for deLesseps S. Morrison as Mayor of New Orleans and Joseph I. Giarrusso as Superintendent of the New Orleans Police Department.

Before RIVES, Circuit Judge, and CHRISTENBERRY and WRIGHT, District Judges.

Called into extraordinary session for November 4, 1960, just ten days before the day fixed by this court for the partial desegregation of the New Orleans public schools,[1] the Louisiana Legislature

---

1. The Orleans Parish school desegregation controversy has been in the federal courts for eight years. Since the decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, in 1954, it has been clear that under the Constitution of the United States segregation in the public schools of Louisiana cannot lawfully continue, and that all state laws in conflict with the Brown holding are null and void. Repeatedly, however, the state legislature has enacted legislation designed to circumvent the law of the land and to perpetuate segregation in the schools of Louisiana.

In 1954, the state adopted a constitutional amendment and two segregation statutes. LSA–Const. art. 12, § 1; former LSA–R.S. 17:81.1, 17:331 et seq. The amendment and Act 555 purported to reestablish the existing state law requiring segregated schools. Act 556 provided for assignment of pupils by the school superintendent. On February 15, 1956, this court held that both the amendment and the two statutes were invalid. The court issued a decree enjoining the School Board, "its agents, its servants, its employees, their successors in office, and those in concert with them who shall receive notice of this order" from requiring and permitting segregation in the New Orleans schools. Bush v. Orleans Parish School Board, D.C., 138 F.Supp. 336, 337, 342, affirmed 5 Cir., 242 F.2d 156, certiorari denied 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436.

Not only was there no compliance with that order, but immediately thereafter the legislature produced a new package of laws, in particular Act 319 (1956), former LSA–R.S. 17:341 et seq. which purported to "freeze" the existing racial status of public schools in Orleans Parish and to reserve to the legislature the power of racial reclassification of schools. On July 1, 1958, this court refused to accept the School Board's contention that Act 319 had relieved the Board of its responsibility to obey the desegregation order. In the words of the court, "Any legal artifice, however cleverly contrived, which would circumvent this ruling [of the Supreme Court, in Brown v. Board of Education, supra] and others predicated on it, is unconstitutional on its face. Such an artifice is the statute in suit." Bush v. Orleans Parish School Board, D.C., 163 F.Supp. 701, 702, affirmed 5 Cir., 268 F.2d 78. See also, Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L. Ed. 1281.

Nevertheless, the legislature continued to contrive circumventive artifices.

In 1958 a third group of segregation laws was enacted, including Act 256, former LSA–R.S. 17:336, which empowered the Governor to close any school under court order to desegregate, as well as any other school in the system. In the first court test of this law it was struck down as unconstitutional by this court on August 27, 1960. Bush v. Orleans Parish School Board, D.C., 187 F.Supp. 42.

On July 15, 1959, the court ordered the New Orleans School Board to present a plan for desegregation, Bush v. Orleans Parish School Board, No. 3630, but there was no compliance. Therefore, on May 16, 1960, the court itself formulated a plan and ordered desegregation to begin with the first grade level in the fall of 1960.

For the fourth time, in its 1960 session, the legislature produced a packet of segregation measures, this time to prevent compliance with the order of May 16, 1960. Four of these 1960 measures—Acts 333, 495, 496 and 542, former LSA–R.S. 17:337, 17:348.1 et seq., 17:347.1 et seq., 17:170—and the three earlier acts referred to above—Act 555 of 1954, Act 319 of 1956, and Act 256 of 1958—were promptly declared unconstitutional by a three-judge court on August 27, 1960, in the combined cases of Bush v. Orleans Parish School Board and Williams v. Davis, and their enforcement by "the Honorable Jimmie H. Davis, Governor of the State of Louisiana, and all those

promptly enacted 25 measures [2] designed to halt, or at least forestall, the implementation of the Orleans Parish School Board's announced proposal to admit five Negro girls of first grade age to formerly all-white schools. The first of these, Act 2 of the First Extraordinary Session of 1960, LSA–R.S. 49:801 et seq.,[3] is the so-called "interposition" statute by which Louisiana declares that it will not recognize the Supreme Court's decision in Brown v. Board of Education, supra, or the orders of this court issued pursuant to the mandate of that case. Insofar as it provides criminal penalties against federal judges and United States marshals who render or carry out such decisions, the Government, by separate suit consolidated here for hearing, seeks an injunction against the Act. The next seven Acts, Nos. 3 through 9, merely repeal statutes earlier ruled on by this court and enjoined as unconstitutional.[4]

The remaining seventeen Acts, numbered 10 through 14 and 16 through 27, are here assailed on constitutional grounds and a temporary injunction against their enforcement is prayed for by the plaintiffs, parents of white school children, in the Williams case. Among these are measures purporting to abolish the Orleans Parish School Board and transfer its function to the Legislature. On November 10, 1960, restraining orders were directed to the appropriate state officers enjoining them from enforcing the provisions of all but one of the statutes in suit pending hearing before this court. Nevertheless, apparently still considering itself the administrator of the New Orleans public schools, the Louisiana Legislature has continued to act in that capacity, issuing its directives by means of concurrent resolutions. House Concurrent Resolutions Nos. 17, 18 and 19. On November 13th, when the enforcement of these resolutions was also restrained on motion of the School Board, the Legislature retaliated by addressing all but one member of the Board out of office. House Concurrent Resolution No. 23. This action by the Legislature also was the subject of an immediate temporary restraining order. As cross-claimant in the Bush case, the original school case filed by parents of Negro children, the School Board now asks for a temporary injunction against these most recent measures. Finally, the court has before it a motion by the School Board to vacate or stay its order fixing November 14, 1960, as the date for the partial desegregation of the local schools.

### Jurisdiction

In view of the fact that one of the actions involved has been pending for more than eight years and that several judgments have already been rendered in the proceeding both here and on appeal,[5] it would seem somewhat late in the day to raise jurisdictional issues. But, in view of the elaborate arguments pressed upon us we have re-examined the matter.

Pretermitting the question of jurisdiction under 28 U.S.C. § 1331, it is, of course, plain that jurisdiction of the claims in the Bush and Williams cases is vested by the provisions of 28 U.S.C. § 1343(3) and of the suit of the United States by 28 U.S.C. § 1345, and that, since in all three matters an injunction is sought against the enforcement of state laws by officers of the state, a court of three judges was properly convened under 28 U.S.C. § 2281.

Insofar as it is denied that the measures under attack work a "deprivation * * * of any right * * * secured by the Constitution of the United

---

persons acting in concert with him, or at his direction, including the defendant, James F. Redmond," was enjoined. Bush v. Orleans Parish School Board, 187 F. Supp. 42, 45. At the same time, the effective date of the desegregation order was postponed to November 14, 1960.

2. An analysis of all 29 Acts passed at the first special session, minus Act 2, and

House Concurrent Resolutions 10, 17, 18, 19 and 23 forms Appendix B to this opinion. Acts 1, 15, 28 and 29 are not involved in these proceedings.

3. The full text of Act 2 forms Appendix A to this opinion.

4. See Note 1.

5. See Note 1.

States," that is a question addressed to the merits. For jurisdictional purposes it suffices that a substantial claim of deprivation has been made. Likewise, the "interposition" defense cannot affect the initial jurisdiction of the court, for it must at least take jurisdiction to determine whether the state act purporting to insulate Louisiana from the force of federal law in the field of public education is constitutionally valid. If the statute is not valid, obviously it can have no effect on the court's jurisdiction. The Eleventh Amendment argument, made again here, has already been fully answered on a prior appeal in the Bush case. See 242 F.2d 156. Of course, the Eleventh Amendment has no application to the suit of the United States.

 Finally, there is no merit in the claim of "legislative immunity" put forward on behalf of the committee of the Legislature and its members who are sought to be enjoined from enforcing the measures which grant them control of the New Orleans public schools. The argument is specious. There is no effort to restrain the Louisiana Legislature as a whole, or any individual legislator, in the performance of a *legislative* function. It is only insofar as the lawmakers purport to act as *administrators* of the local schools that they, as well as all others concerned, are sought to be restrained from implementing measures which are alleged to violate the Constitution. Having found a statute unconstitutional, it is elementary that a court has power to enjoin all those charged with its execution. Normally, these are officers of the executive branch, but when the legislature itself seeks to act as executor of its own laws, then, quite obviously, it is no longer legislating and is no more immune from process than the administrative officials it supersedes. As Chief Justice Marshall said in Marbury v. Madison, 1 Cranch 137, 170, 5 U.S. 137, 170, 2 L.Ed. 60: "It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of is-

suing [an injunction] is to be determined."

*Interposition*

Except for an appropriation measure to provide for the cost of the special session, the very first statute enacted by the Louisiana Legislature at this Extraordinary Session was the interposition act. That was appropriate because it is this declaration which sets the tone and gives substance to all the subsequent legislation. For the most part, the measures that followed merely implement the resolve announced in the interposition act to "maintain racially separate public school facilities * * * when such facilities are in the best interest of their citizens," notwithstanding "the decisions of the Federal District Courts in the State of Louisiana, prohibiting the maintenance of separate schools for whites and negroes and ordering said schools to be racially integrated," which decisions, being "based solely and entirely on the the pronouncements of Brown v. Topeka Board of Education," are "null, void and of no effect as to the State of Louisiana." Significantly, the Attorney General, appearing for the State and most of its officers, rested his sole defense on this act. Without question, the nub of the controversy is in the declaration of interposition. If it succeeds, there is no occasion to look further, for the state is then free to do as it will in the field of public education. On the other hand, should it fail, nothing can save the "package" of segregation measures to which it is tied.

 Interposition is an amorphous concept based on the proposition that the United States is a compact of states, any one of which may interpose its sovereignty against the enforcement within its borders of any decision of the Supreme Court or act of Congress, irrespective of the fact that the constitutionality of the act has been established by decision of the Supreme Court. Once interposed, the law or decision would then have to await approval by constitutional amendment before enforcement within the in-

terposing state. In essence, the doctrine denies the constitutional obligation of the states to respect those decisions of the Supreme Court with which they do not agree.[6] The doctrine may have had some validity under the Articles of Confederation. On their failure, however, "in Order to form a more perfect Union," the *people*, not the states, of this country ordained and established the Constitution. Martin v. Hunter's Lessee, 1 Wheat. 304, 324, 14 U.S. 304, 324, 4 L.Ed. 97. Thus the keystone of the interposition thesis, that the United States is a compact of states, was disavowed in the Preamble to the Constitution.[7]

Nevertheless, throughout the early history of this country, the standard of interposition was raised whenever a state strongly disapproved of some action of the central government. Perhaps the most precise formulation of the doctrine can be found in the Virginia and Kentucky interposition resolutions against the Alien and Sedition Acts. Jefferson was the reluctant author of the Kentucky resolution, while Madison wrote Virginia's. Jefferson was not proud of his work for he never admitted authorship. And Madison, after publicly espousing the cause of interposition for a short time, spent much of his energy com-

6. The short answer to interposition may be found in Cooper v. Aaron, 358 U.S. 1, 17–18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5. In view of the apparent seriousness with which the State of Louisiana makes the point, however, we will labor it. In Cooper v. Aaron, the Supreme Court stated:

"* * * we should answer the premise of the actions of the Governor and Legislature that they are not bound by our holding in the Brown case. It is necessary only to recall some basic constitutional propositions which are settled doctrine.

"Article VI of the Constitution makes the Constitution the 'supreme Law of the Land.' In 1803, Chief Justice Marshall, speaking for a unanimous Court, referring to the Constitution as 'the fundamental and paramount law of the nation', declared in the notable case of Marbury v. Madison, 1 Cranch 137, 177 [2 L.Ed. 60], that 'It is emphatically the province and duty of the judicial department to say what the law is.' This decision declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system. It follows that the interpretation of the Fourteenth Amendment enunciated by this Court in the Brown case is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, cl. 3, 'to support this Constitution.'" Cooper v. Aaron, supra.

7. Of course, even the "compact theory" does not justify interposition. Thus, Edward Livingston, Louisiana's noted lawgiver, though an adherent of that theory, strongly denied the right of a state to nullify federal law or the decisions of the federal courts. While representing Louisiana in the United States Senate and participating in its debates in January, 1830, he stated his view "That, by the institution of this government, the states have unequivocally surrendered every constitutional right of impeding or resisting the execution of any decree or judgment of the Supreme Court, in any case of law or equity between persons or on matters, of whom or on which that court has jurisdiction, *even if such decree or judgment should, in the opinion of the states, be unconstitutional;*" "That the alleged right of a state to put a *veto* on the execution of a law of the United States, which such state may declare to be unconstitutional, attended (as, if it exist, it must be) with the correlative obligation, on the part of the general government, to refrain from executing it; and the further alleged obligation, on the part of that government, to submit the question to the states, by proposing amendments, are not given by the Constitution, nor do they grow out of the reserved powers;" "That the introduction of this feature in our government would totally change its nature, make it inefficient, invite to dissension, and end, at no distant period, in separation; and that, if it had been proposed in the form of an explicit provision in the Constitution, it would have been unanimously rejected, both in the Convention which framed that instrument and in those which adopted it." Quoted in 4 Elliot's Debates 519–520. (Emphasis added.)

batting the doctrine and finally admitted its bankruptcy in these words:

"The jurisdiction claimed for the Federal Judiciary is truly the only defensive armor of the Federal Government, or rather for the Constitution and laws of the United States. Strip it of that armor, and the door is wide open for nullification, anarchy and convulsion. * * *" Letter, April 1, 1833, quoted in 1 Warren, The Supreme Court in United States History (Revised Ed. 1926), 740.

While there have been many cases which treat of segmented facets of the interposition doctrine, in only one is the issues squarely presented. In United States v. Peters, 5 Cranch 115, 9 U.S. 115, 3 L.Ed. 53, the legislature of Pennsylvania interposed the sovereignty of that state against a decree of the United States District Court sitting in Pennsylvania. After much litigation,[8] Chief Justice Marshall finally laid the doctrine to rest thusly:

"If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the Constitution itself becomes a solemn mockery; and the nation is deprived of the means of enforcing its laws by the instrumentality of its own tribunals. So fatal a result must be deprecated by all; and the people of Pennsylvania, not less than the citizens of every other state, must feel a deep interest in resisting principles so destructive of the Union, and in averting consequences so fatal to themselves." United States v. Peters, supra, 5 Cranch 136, 9 U. S. 136.

Interposition theorists concede the validity, under the supremacy clause, of acts of Congress and decisions of the Supreme Court except in the area reserved for the states by the Tenth Amendment. But laws and decisions in this reserved area, the argument runs, are by definition *unconstitutional,* hence are not governed by the supremacy clause and do not rightly command obedience. This, of course, is Louisiana's position with reference to the Brown decision in the recent Act of Interposition. Quite obviously, as an inferior court, we cannot overrule that decision. The issue before us is whether the Legislature [9] of Louisiana may do so.

Assuming always that the claim of interposition is an appeal to legality, the inquiry is who, under the Constitution, has the final say on questions of constitutionality, who delimits the Tenth Amendment. In theory, the issue might have been resolved in several ways. But, as a practical matter, under our federal system the only solution short of anarchy was to assign the function to *one supreme court.* That the final decision should rest with the judiciary rather than the legislature was inherent in the concept of constitutional government in which legislative acts are subordinate to the paramount organic law, and, if only to avoid "a hydra in government from which nothing but contradiction and confusion can proceed," final authority had to be centralized in a single national court. The Federalist, Nos. 78, 80, 81, 82. As Madison said before the adoption of the Constitution: "Some such tribunal is clearly essential to prevent an appeal to the sword and a dissolution of the compact; and that it ought to be established under the general rather than under the local governments, or, to speak

---

8. For a detailed statement of the case, its background and aftermath, see the address by Mr. Justice Douglas reprinted at 19 F.R.D. 185 and 9 Stan.L.Rev. 3.

9. It is interesting to note that even Calhoun, whose writings, in addition to those of Madison, are now invoked by Louisiana, did not pretend that the *legislature* of the

state had a right to interpose, but held that a popular *convention* within the state was the proper medium for asserting state sovereignty. See his "Fort Hill Letter" of August 28, 1832, quoted in pertinent part in Miller and Howell, "Interposition, Nullification and the Delicate Division of Power in a Federal System," 5 J.Pub.L. 2, 31.

more properly, that it could be safely established under the first alone, is a position not likely to be combated." The Federalist, No. 39.

And so, from the beginning, it was decided that the Supreme Court of the United States must be the final arbiter on questions of constitutionality. It is of course the guardian of the Constitution against encroachments by the national Congress. Marbury v. Madison, supra. But more important to our discussion is the constitutional role of the Court with regard to state acts. The original Judiciary Act of 1789 confirmed the authority of the Supreme Court to review the judgments of all state tribunals on constitutional questions. Act of Sept. 24, 1789, § 25, 1 Stat. 73, 85. See Martin v. Hunter's Lessee, supra; Worcester v. Georgia, 6 Pet. 515, 31 U.S. 515, 8 L.Ed. 483; Cohens v. Virginia, 6 Wheat. 264, 19 U.S. 264, 5 L.Ed. 257; Ableman v. Booth, 21 How. 506, 62 U.S. 506, 16 L.Ed. 169. Likewise from the first one of its functions was to pass on the constitutionality of state laws. Fletcher v. Peck, 6 Cranch 87, 10 U.S. 87, 3 L.Ed. 162; M'Culloch v. Maryland, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579. And the duty of the Court with regard to the acts of the state executive is no different. Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375; Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5. The fact is that the Constitution itself established the Supreme Court of the United States as the final tribunal for constitutional adjudication. By definition, there can be no appeal from its decisions.

The initial conclusion is obvious enough. Plainly, the states, whose proceedings are subject to revision by the Supreme Court, can no more pretend to review that Court's decision on constitutional questions than an inferior can dispute the ruling of an appellate court. From this alone "it follows that the interpretation of the Fourteenth Amendment enunciated by [the Supreme] Court in the Brown case is the supreme law of the land, and [that] Art. VI of the Con-

stitution makes it of binding effect on the States 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" Cooper v. Aaron, supra, 358 U.S. 18, 78 S.Ct. 1410.

But this is not all. From the fact that the Supreme Court of the United States rather than any state authority is the ultimate judge of constitutionality, another consequence of equal importance results. It is that the jurisdiction of the *lower* federal courts and the correctness of their decisions on constitutional questions cannot be reviewed by the state governments. Indeed, since the appeal from their rulings lies to the Supreme Court of the United States, as the only authoritative constitutional tribunal, neither the executive, nor the legislature, nor even the courts of the state, have any competence in the matter. It necessarily follows that, pending review by the Supreme Court, the decisions of the subordinate federal courts on constitutional questions have the authority of the supreme law of the land and must be obeyed. Assuredly, this is a great power, but a necessary one. See United States v. Peters, supra, 5 Cranch 135, 136, 9 U.S. 135, 136.

Apprehensive of the validity of the proposition that the Constitution is a compact of states, interposition asserts that at least a ruling challenged by a state should be suspended until the people can ratify it by constitutional amendment. But this invocation of "constitutional processes" is a patent subterfuge. Unlike open nullification, it is defiance hiding under the cloak of apparent legitimacy. The obvious flaw in the argument lies in the unfounded insistence that *pending a vote on the proposed amendment* the questioned decision must be voided. Even assuming their good faith in proposing an amendment against themselves, the interpositionists want too much. Without any semblance of legality, they claim the right at least temporarily to annul the judgment of the highest court, and, should they succeed in defeating the amendment proposed, they presume to interpret that victory as

voiding forever the challenged decision. It requires no elaborate demonstration to show that this is a preposterous perversion of Article V of the Constitution. Certainly the Constitution can be amended "to overrule" the Supreme Court. But there is nothing in Article V that justifies the presumption that what has authoritatively been declared to be the law ceases to be the law while the amendment is pending, or that the non-ratification of an amendment alters the Constitution or any decisions rendered under it.[10]

▉ The conclusion is clear that interposition is not a *constitutional* doctrine. If taken seriously, it is illegal defiance of constitutional authority. Otherwise, "it amounted to no more than a protest, an escape valve through which the legislators blew off steam to relieve their tensions." Shuttlesworth v. Birmingham Board of Education, D.C.N.D. Ala., 162 F.Supp. 372, 381. However solemn or spirited, interposition resolutions have no legal efficacy. Such, in substance, is the official view of Virginia, delivered by its present Governor while Attorney General.[11] And there is a general tacit agreement among the other interposing states [12] which is amply reflected in their failure even to raise the argument in the recent litigation, the outcome of which they so much deplore. Indeed, Louisiana herself has had an "interposition" resolution on the books since 1956,[13] and has never brought it forth. The enactment of the resolution in statutory form does not change its substance. Act 2 of the First Extraordinary Session of 1960 is not legislation in the true sense. It neither requires nor denies. It is a mere statement of principles, a political polemic, which provides the predicate for the second segregation

10. Madison also had occasion to comment on this modified interposition:
"* * * We have seen the absurdity of such a claim in its naked and suicidal form. Let us turn to it as modified by South Carolina, into a right of every State to resist within itself the execution of a Federal law deemed by it to be unconstitutional, and to demand a convention of the States to decide the question of constitutionality; the annulment of the law to continue in the meantime, and to be permanent unless three-fourths of the States concur in overruling the annulment.
"Thus, during the temporary nullification of the law, the results would be the same from [as?] those proceeding from an unqualified nullification, and the result of the convention might be that seven out of twenty-four States might make the temporary results permanent. It follows, that any State which could obtain the concurrence of six others might abrogate any law of the United States, constructively, whatever, and give to the Constitution any shape they please, in opposition to the construction and will of the other seventeen, each of the seventeen having an equal right and authority with each of the seven. Every feature in the Constitution might thus be successively changed; and after a scene of unexampled confusion and distraction, what had been unanimously agreed to as a whole, would not, as a whole, be agreed to by a single party. The amount of this modified right of nullification is, that a single State may arrest the operation of a law of the United States, and institute a process which is to terminate in the ascendancy of a minority over a large majority in a republican system, the characteristic rule of which is, that the major will is the ruling will. * * * " Madison, On Nullification (1835–1836), in IV Letters and Other Writings of James Madison (Congress ed. 1865), 409.

11. See the Opinion of Attorney General Almond rendered February 14, 1956, in 1 Race Rel.L.Rep. 462.

12. Interposition declarations have been adopted in Alabama, Act 42 of 1st Spec. Sess.1956; Georgia, H.Res. 185 of 1956, Laws 1956, p. 642; Mississippi, Sen.Conc. Res. 125 of 1956, Laws 1956, p. 741; South Carolina, Act of Feb. 14, 1956, 49 St. at Large, p. 2172; Virginia, Sen. Joint Res. 3 of 1956, Acts 1956, p. 1213; Tennessee, H.Res. 1 and 9 of 1957, Pub. Acts 1957, pp. 1437, 1449; and Florida, Sen.Conc.Res. 17–XX of Spec.Sess.1956, Acts 1956, Sp.Sess., p. 401, and H.Conc. Res. 174 of 1957, Acts 1957, p. 1217. For text of these acts and resolutions, see 1 Race Rel.L.Rep. 437, 438, 440, 443, 445, 948; 2 id. 228, 481, 707.

13. H.Conc.Res. 10 of 1956. The text of the Resolution is reproduced in 1 Race Rel.L.Rep. 753.

package of 1960, the legislation in suit. Its unconstitutional premise strikes with nullity all that it would support.

*The Other Legislation*

■ Without the support of the Interposition Act, the rest of the segregation "package" falls of its own weight. However ingeniously worded some of the statutes may be, admittedly the sole object of every measure adopted at the recent special session of the Louisiana Legislature is to preserve a system of segregated public schools in defiance of the mandate of the Supreme Court in Brown and the orders of this court in Bush. What is more, these acts were not independent attempts by individual legislators to accomplish this end. The whole of the legislation, sponsored by the same select committee, forms a single scheme, all parts of which are carefully interrelated. The proponents of the "package" were themselves insistent on so labelling it, and expressly argued that the passage of every measure proposed was essential to the success of the plan. In view of this, the court might properly void the entire bundle of new laws without detailed examination of its content. For, as the Supreme Court said in Cooper v. Aaron, supra, 358 U.S. 17, 78 S.Ct. 1409, "the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the Brown case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive

schemes for segregation whether attempted 'ingeniously or ingenuously'" But we shall nevertheless give brief consideration to each of the measures enacted.

*Re-Enactment of Statutes Previously Declared Unconstitutional*

■ Five of the new statutes merely re-enact laws already voided by this court on August 27, 1960. Bush v. Orleans Parish School Board, D.C., 187 F.Supp. 42. Act 10 of the recent session is, except for the most minor stylistic changes, a verbatim copy of Act 542 of 1960 [14] which required the Governor to close any school threatened with "disorder, riots, or violence." We said of that law that "its purpose speaks louder than its words." The same is true of the present statute. It can fare no better.

Likewise, Acts 11, 12, 13 and 14, all in effect school closure measures, are, except in one particular, carbon copies of statutes held invalid by the decision rendered August 27.[15] The only difference, common to all four acts, is the deletion of references to "segregation," "integration" or "separate facilities" in the earlier statutes and the substitution of the words "consistent with the Constitution and laws of this State or State Board of Education policies, rules or regulations." But this euphemism cannot save the legislation. Indeed, the Interposition Act itself makes it clear enough that the policy of the state is to maintain segregation in public education despite the mandate of the Supreme Court and the orders of this court. And other state

14. Former La.R.S. 17:170, repealed by Act 4 of 1st Extra.Sess.1960.

15. Act 11 is a re-enactment of Act 256 of 1958, former La.R.S. 17:336, repealed by Act 7, 1st Extra.Sess.1960, which authorized the Governor to close any school under a court order to integrate.

Act 12 is a re-enactment of Act 495 of 1960, former La.R.S. 17:348.1–348.7, repealed by Act 6, 1st Extra.Sess.1960, which provided that whenever the Governor had taken over control of any school because it was under an order to integrate he might close all the public schools of the state.

Act 13 is a re-enactment of Act 333 of 1960, former La.R.S. 17:337, repealed by Act 8, 1st Extra.Sess.1960, which prohibited the furnishing of school books, supplies or funds to any integrated school.

Act 14 is a re-enactment of Act 555 of 1954, former La.R.S. 17:331–334, which required segregation in public schools as an exercise of the state's police power. Act 555 was first declared unconstitutional in Bush v. Orleans Parish School Board, D.C., 138 F.Supp. 336, affirmed 5 Cir., 242 F.2d 156. It was again invalidated by this court on August 27, 1960, 187 F.Supp. 42.

laws, still unchallenged, expressly promote separation of the races in public schools.[16]

### The New General Measures

■ In addition to the re-enacted statutes and the acts aimed specifically at the New Orleans School Board, a group of carefully interlocking measures was adopted at the recent Legislature. The pattern worked out is as follows: In order to forestall any effective integration order for this school year, present enrollment on a segregated basis is "frozen" and transfers are forbidden (Act 26); but, for the future, any school under an order to desegregate is immediately closed (Act 22), whereupon the local school board ceases to exist (Act 21); to carry out these directives, by force if necessary, the state police are given additional powers and placed under the orders of the Legislature (Act 16), and if demonstrators are needed, they may now be recruited among the students who are no longer compelled to go to school (Act 27); to assure that an integrated school does close, the new legislation provides that if it continues to operate it shall enjoy no accreditation (Act 20), teachers shall lose their certification (Act 23), and the students themselves shall receive no promotion or graduation credits (Act 24). A mere recitation of the scheme suffices. No one dare contest the sole purpose of all this legislation is to defeat the constitutional right of colored children to attend desegregated schools. Since such is their purpose, they are all unconstitutional. Gomillion v. Lightfoot, 81 S.Ct. 125; Cooper v. Aaron, supra, 358 U.S. 17, 78

S.Ct. 1401; Brown v. Board of Education, supra; Lane v. Wilson, supra, 307 U.S. 275, 59 S.Ct. 876.

### Measures Relating to the Orleans Parish School Board

■ Finally, there is a series of measures which purport to abolish the Orleans Parish School Board, culminating, somewhat inconsistently, in the Resolution which "addresses out of office" four of the five members of that Board. In defense of these actions, it is said that they concern only the internal political affairs of the state which, within the framework of local law, the legislature may conduct as it sees fit, and which, accordingly, are none of this court's business. With special emphasis, it is argued that the exercise by a state legislature of its right to withdraw powers previously delegated by it to an inferior political body of its own creation presents no federal question, constitutional or otherwise, and, in the absence of diversity of citizenship, is not reviewable by a federal court. On the other hand, plaintiffs assert that these measures, however innocent on their face, were specifically designed to deprive them of their constitutional rights, and that allegation, which was neither contradicted nor qualified, is supported by the facts. Indeed, Acts 17, 18 and 25 which purport to abolish the New Orleans School Board were part and parcel of the original "segregation package" introduced on the first day of the special session of the Legislature, House Concurrent Resolutions 10, 17, 18 and 19 expressly implemented the earlier statutes,[17] and House Concurrent Resolution

---

16. See, e. g., LSA–R.S. 17:391.1–391.16, in which "The legislature of Louisiana recognizes and hereby affirms * * * that no child will be forced to attend a school with children of another race in order to get an education," and provides for grants to the white children of an integrated school; and LSA–R.S. 17:462, 493, and 523, which penalize teachers, school bus operators, and other school employees who advocate or assist in bringing about integration.

17. Resolution No. 10 delegated to an eight-man legislative committee full control over the New Orleans schools; No. 17 re-transferred that control to the Legislature as a whole, converting the committee into an investigative body with subpoena powers; in No. 18, the Legislature, acting as administrator of the New Orleans schools, purports to fire the local superintendent of schools and the School Board's attorney; and No. 19 declared a school holiday for November 14, the day

No. 23 explicitly states that the School Board members were removed from office for failing to abandon their duties in compliance with the Acts and Resolutions just enumerated.

As to these measures, then, we are admittedly in an area peculiarly reserved for exclusive state action. But, just as clearly, we know that the sole object of the legislation is to deprive colored citizens of a right conferred upon them by the Constitution of the United States. The question is whether the protective arm of the Constitution reaches into the "inner sanctum" where the state conducts what it considers its strictly private business. The answer is eloquently stated in Gomillion v. Lightfoot, 81 S.Ct. 125, 130, decided by the Supreme Court November 14, 1960. There, in holding an act of a state legislature redefining municipal boundaries so as to exclude Negro citizens clearly unconstitutional, the Court stated:

"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right. This principle has had many applications. It has long been recognized in cases which have prohibited a State from exploiting a power acknowledged to be absolute in an isolated context to justify the imposition of an 'unconstitutional condition.' What the Court has said in those cases is equally applicable here, *viz.*, that 'Acts generally lawful may become unlawful when done to accomplish an unlawful end, United States v. Reading Co., 226 U.S. 324, 357 [33 S.Ct. 90, 57 L.Ed. 243], and a constitutional power cannot be used by way of condition to attain an unconstitutional result.' Western Union Telegraph Co. v. Foster, 247 U.S. 105, 114 [38 S.Ct. 438, 62 L.Ed. 1006] * * *"

*Motion to Vacate*

The last matter presented for our consideration is the School Board's plea that we postpone the effective date of the order compelling desegregation of first grade classes by November 14. The Board suggests that local conditions are so disturbed that orderly compliance is difficult at this time, especially in view of its own precarious legal and financial position. All this may be true, but the history of this litigation leaves some doubt about the advisability of further postponing an inevitable deadline. Indeed, the date originally set for making a start in the direction of desegregation has already been postponed two months and it is far from clear that this delay improved conditions. But, in any event, though we be persuaded of the School Board's good faith, there can be no question of delaying still longer the enjoyment of a constitutional right which was solemnly pronounced by the Supreme Court of the United States more than six years ago. As that Court itself said in rejecting a similar plea in Cooper v. Aaron, supra, 358 U.S. 15–16, 78 S.Ct. 1408:

"One may well sympathize with the position of the Board in the face of the frustrating conditions which have confronted it, but, regardless of the Board's good faith, the actions of the other state agencies responsible for those conditions compel us to reject the Board's legal position. Had Central High School been under the direct management of the State itself, it could hardly be suggested that those immediately in charge of the school should be heard to assert their own good faith as a legal excuse for delay in implementing the constitutional rights of these respondents, when vindication of those rights was rendered difficult or impossible by the actions of other state officials. The situation here is in no different posture because the members of the School Board and the

fixed for the desegregation of first grade classes in New Orleans, and directed the

sergeants-at-arms of the Legislature to enforce the holiday.

Superintendent of Schools are local officials; from the point of view of the Fourteenth Amendment, they stand in this litigation as the agents of the State.

"The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. As this Court said some 41 years ago in a unanimous opinion in a case involving another aspect of racial segregation: 'It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution.' Buchanan v. Warley, 245 U.S. 60, 81 [38 S.Ct. 16, 20, 62 L.Ed. 149]. Thus law and order are not here to be preserved by depriving the Negro children of their constitutional rights. The record before us clearly establishes that the growth of the Board's difficulties to a magnitude beyond its unaided power to control is the product of state action. Those difficulties as counsel for the Board forthrightly conceded on the oral argument in this Court, can also be brought under control by state action."

## Conclusion

For the foregoing reasons, this court denies the interposition claim of the State of Louisiana and declares Acts 2, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26 and 27 and House Concurrent Resolutions 10, 17, 18, 19 and 23 of the First Extraordinary Session of 1960 unconstitutional. This court will prepare the decree enjoining their enforcement. The motions to dismiss are denied. The motion to vacate, or delay the effective date of, the order requiring desegregation of the New Orleans public schools is likewise denied.

## Appendix A

### Act No. 2 of First Extraordinary Session, 1960
### An Act

To interpose the sovereignty of the State of Louisiana against the unlawful encroachments by the judicial and executive branches of the Federal Government in the operation of public schools of the State of Louisiana, which constitute, a deliberate, palpable and dangerous exercise of governmental powers not granted to the United States by the United States Constitution; to prohibit all officers, agents and persons acting under orders of the federal courts or any other branch of the Federal Government from interfering with the maintenance of any State public school, or any officer, agent or employee of the State or any subdivision of the state engaged in the maintenance of such schools or in carrying out the provisions of this Act, or other law, right or power of the State of Louisiana under its reserved powers provided by the 10th Amendment to the United States Constitution; and to provide penalties for violations hereof.

Whereas, as set forth in the 1798 Kentucky Legislature Resolutions of Interposition, prepared by Thomas Jefferson, then the Vice-President of the United States,

"That the several States composing the United States of America are not united on the principle of unlimited submission to their General Government; but that by compact under the style and title of a Constitution for the United States and of amendments thereto, they constituted a general government for special purposes, delegated to that government certain definite powers, reserving each State to itself, the residuary mass of right to their own self-government; and that whensoever the General Government assumes undelegated powers, its acts are unauthoritative, void, and of no force.

"That to this compact each State acceded as a State, and is an integral party, its co-States forming as to itself, the other party;

"That the Government created by this compact was not made the exclusive or final judge of the extent the measure of its powers; but that as in all other cases of compact among parties having no common judge, each party had an equal right to judge for itself, as well of infractions as of the mode and measure of redress. * * *"

"That this Legislature "considers the Federal Union upon the terms and for the purposes specified in the late compact, conducive to the liberty and happiness of the several States; that it does now unequivocally declare its attachment to the Union, and to that compact, agreeably to its obvious and real intention, and will be among the last to seek its dissolution;

"That if those who administer the general government be permitted to transgress the limits fixed by that compact, by a total disregard to the special delegations of power therein contained, and annihilation of the State governments, and the creation, upon their ruins, of a general consolidated government, will be the inevitable consequence;

"That the several States who formed that instrument, being sovereign and independent, have the unquestionable right to judge of the infraction; and that a nullification, by those sovereignties of all unauthorized acts done under color of that instrument, is the rightful remedy; and

"That, although this State, as a party to the Federal compact, will bow to the laws of the Union, yet it does, at the same time, declare that it will not now, or ever hereafter, cease to oppose, in a constitutional manner, every attempt, at whatever quarter so offered, to violate that compact."

Whereas, as further set forth in the 1799 Virginia Legislature Resolution of Interposition, prepared by James Madison.

This Legislature "unequivocally expresses a firm resolution to maintain and defend the Constitution of this State, against every aggression, either foreign or domestic, and that they will support the government by the United States in all measures, warranted" by the United States Constitution; and this Legislature "most solemnly declares a warm attachment to the Union of the States, to maintain which, it pledges its powers; and that for this end, it is their duty, to watch over and oppose every infraction of those principles, which constitute the only basis of that Union, because a faithful observance of them can alone secure its existence, and the public happiness."

"This Assembly explicitly and peremptorily declares that it views the powers of the Federal Government as resulting from the compact, to which the States are parties, as limited by the plain sense and intention of the instrument constituting that compact; as no further valid than they are authorized by the grants enumerated in that compact, and that in case of a deliberate, palpable and dangerous exercise of other powers not granted by the said compact, the States who are parties thereto have the right, and are in duty bound, to interpose for arresting the progress of the evil, and for maintaining, within their respective limits, the authorities, rights and liberties appertaining to them."

Whereas, the principle and doctrine of "Interposition" thus presented by Thomas Jefferson, principal author of the Declaration of Independence, and by James Madison, generally known in his time as the "Father of the Constitution," was given the full sanction of the people of the United States as shown by the fact that from 1800 Jefferson and then Madison were each elected to two successive terms as President of the United States, and the Jeffersonian-Madison concept of the Constitution and State Rights

became so firmly established and universally accepted that the political party which opposed it, the Federalist Party, never elected another President, but shriveled and died of decay.

Whereas, other Acts of Interposition by other States of the Union, against unlawful encroachments by the Federal Government have contributed to the preservation of constitutional government in this country including:

The 1792 Georgia Act, which resulted in the adoption of the 11th Amendment upholding Georgia's sovereignty rights against the United States Supreme Court's illegal decision;

The Pennsylvania 1809 action against the execution of an unlawful federal court decree which usurped ungranted powers;

The Hartford Connecticut Convention of the States of Massachusetts, Rhode Island, New Hampshire, Vermont and Connecticut in 1814 when they exercised the right of Interposition and nullified Acts of Congress as constituting "deliberate, dangerous and palpable infractions of the Constitution," affecting the sovereignty of those States and the liberties of their people;

The Georgia and Alabama Acts of Nullification against federal laws and court decrees usurping ungranted powers;

The 1880 Iowa Act which successfully defied an effort on the part of the United States Supreme Court to reverse a position taken by the Iowa Supreme Court holding extensive grants to expanding Railroads unlawful. The Supreme Court of the United States was forced to back down.

The Acts of Nullification by fourteen of the Northern States against Federal Statutes relative to fugitive slaves brought about by the Dred Scott decision of the United States Supreme Court in which some of their Legislatures declared the court had acted "without process or any of the forms recognized by law," and denounced the court's "assumption of power," and that the court's effort "to become the final arbiter" was indirect conflict with the Constitution and that the several states which formed that instrument (the United States Constitution) have the unquestionable right to judge of its infraction, and that Interposition of the state's sovereignty is the rightful remedy; and

The South Carolina 1813 Act against the Federal Tariff Laws which would have caused financial chaos and ruin to that state, and that state's Legislature Act which promptly nullified the Federal Force Bill which attempted to nullify South Carolina's nullification when that state's struggle to save constitutional government and its state sovereignty was based upon the proposition as fundamental then as now, as paraphrased by John C. Calhoun that

"Stripped of all its covering, the naked question is whether ours is a Federal or a Consolidated Government; a constitutional or absolute one; a Government resting ultimately on the solid basis of the sovereignty of the States or on the unrestrained will of a majority; a form of Government, as in all other unlimited ones, in which injustice, and violence, and force must finally prevail."

Whereas, contrary to its well ordered line of decisions in 1896, Plessy v. Ferguson, 163 U.S. [537] 550 [16 S.Ct. 1138, 41 L.Ed. 256], affirming all prior federal and state court decisions in point, and repeatedly until 1950 [Sweatt v. Painter], 339 U.S. 629 [70 S.Ct. 848, 94 L.Ed. 1114] and [McLaurin v. Oklahoma State Regents for Higher Ed., 339 U.S. 637] 639 [70 S.Ct. 851, 94 L.Ed. 1149], that the Fourteenth Amendment did not prohibit the States, in the exercise of their police power, from providing separate but equal facilities for different races by the establishment of separate schools for white and colored children, and "the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of federal authority with the manage-

ment of such schools cannot be justified," [Cumming v. County Board of Ed.] 175 U.S. 528 [20 S.Ct. 197, 44 L.Ed. 262], and contrary to the fact that the same Congress which submitted the Joint Resolution for the Fourteenth Amendment had passed an Act for segregated schools in the District of Columbia, which is under its jurisdiction; and contrary to the fact that the same court held and reaffirmed in scores of cases since 1837, that no provision of the United States Constitution and one of the Amendments added to that instrument was intended or designed to interfere with the police power of the various States to prescribe regulations to promote the health, peace, morals, education and good order of the people, the United States Supreme Court, in Brown v. Topeka, and consolidated cases, rendered a decision on May 17, 1954, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873], repudiating the Fourteenth Amendment as having no intended effect on public education, and stating it could not "turn the clock back to 1868 when the Amendment was adopted, or even to 1896" when the Plessy v. Ferguson decision was written by it (holding that the Fourteenth Amendment did not prohibit States from operating separate public schools for white and negro children), because,

"Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson (1896) this finding is amply supported by modern authority."

and citing as its 1954 modern "psychological" authority, not any provision of the Constitution or Act of Congress enacted pursuant thereto, but books written by various persons whose memberships in communist and subversive organizations dedicated to the overthrow of the United States government and the Constitution were matters of public record in the files of Congress and the Department of Justice, and easily available to the members of the Court, and in its decree in said Brown v. Topeka case, 349 U.S. 294 [75 S.Ct. 753, 99 L.Ed. 1083], the Supreme Court directed all lower federal courts to render unlawful orders to compel all state public schools in the country to racially integrate "with all deliberate speed."

Whereas, in any event the original decision in Brown vs. Topeka Board of Education exhausted the judicial power of the United States and pursuant to the plain provisions of Section 5 of the Fourteenth Amendment any implementation of such decision was confided to the Congress and not to the District Courts; that the remand of these cases to the District Courts thus constituted a usurpation not only of the constitutional power of the State, but also of the legislative power of the Congress.

Whereas, the Fourteenth Amendment is not self-operative by its very terms, and grants to the Congress, and not to the Courts, the power to enforce, by appropriate legislation, the provisions of this article, and the Congress has enacted no legislation purporting or attempting to prohibit the States from maintaining separate schools for whites and negroes; as in fact, and in law, the Congress would have no valid power to so legislate, because said Fourteenth Amendment contains no provision which prohibits, or which could lawfully be construed as granting to Congress the power to enact laws to prohibit the States from providing separate schools for different races.

Whereas, further evidence of the deliberate, palpable and dangerous usurpation of ungranted power and its violation of the United States Constitution is shown by the fact that the United States Supreme Court cited as authority for its decision in the Brown v. Topeka consolidated cases so-called modern authority, or books on psychology and sociology which had not been offered in evidence during trial of said cases, and which would not have been admissible even if offered, but were listed in an appendix attached to a brief filed for the first time by the N.A.A.C.P. in the Supreme Court; and the very use of such books as authority for its decision in said case, without opportunity to the defendants to examine or rebut has been consistently

934

held by the same Court in its previous decisions to constitute a denial of the fundamentals of a trial, and a denial of "due process of law" in violation of the Fifth Amendment of the Constitution, and would be condemnation without trial [United States v. Abilene & S. Ry. Co.] 265 U.S. 274 [44 S.Ct. 565, 68 L.Ed. 1016], [Ohio Bell Tel. Co. v. Public Utilities Comm.] 301 U.S. 292 [57 S.Ct. 724, 81 L.Ed. 1093] [Saunders v. Shaw] 244 U.S. 317 [37 S.Ct. 638, 61 L.Ed. 1163].

Whereas, forced racial integration of public schools by the Federal Government in Washington, District of Columbia, as reported after investigation by the Committee on the District of Columbia of the House of Representatives, 84th Congress, 2nd Session, 1957, results in continual disturbances of the peace, acts of violence, thefts, immoral conduct on the part of negro boys against white girls and negro girls' immoral propositions to white boys, assaults and rapes by negroes of white school girls and teachers, which caused a marked lowering of educational standards, and which also caused an exodus of a large part of the white population from the District of Columbia to avoid such a situation against the best interests of the health, peace, morals, education and good order of the people; all of which is the duty of and within the sole power of the state to protect and promote against unlawful usurpations by the Federal Government.

Whereas, said Supreme Court public school integration decision, and the decisions and orders rendered by federal, district and circuit courts decreeing racial integration of all public schools in the City of New Orleans beginning with the September, 1960 session, and in other parishes of the State of Louisiana, constitute an unlawful encroachment by the Federal Government and is a deliberate, palpable and dangerous exercise of governmental powers not granted by the United States Constitution, but specifically reserved to the states, by the 10th Amendment, to promote the health, peace, morals, education and good order of the people, therefore:

Be it enacted by the Legislature of Louisiana:

Section 1. That by substituting the current political and social philosophy of its members to unsettle the great constitutional principles so clearly established, the federal courts destroyed the stability of the Constitution and usurped the power of Congress to submit, and of the several states to approve, constitutional changes as required by the Constitution, and since the usurpation of the rights reserved to the states is by the judicial branch of the Federal Government, the issues raised by said decision and federal court actions thereunder are of such grave import *as to require this sovereign state to judge for itself of the infraction of the Constitution.*

Section 2. That the decision of the United States Supreme Court in the case of Brown v. Topeka Board of Education, on May 17, 1954, constitutes a deliberate, palpable and dangerous attempt to change the true intent and meaning of the Constitution, and *said decision itself is unconstitutional* and in violation of the 14th Amendment, and it thereby establishes a judicial precedent, if allowed to stand, for the ultimate destruction of constitutional government.

Section 3. *That the States have never delegated to the United States Government,* nor to any branch of that government, *the power to change the Constitution* nor have they surrendered to the Federal Government the power to prohibit to the States the right to maintain racially separate public school facilities or the right to determine when such facilities are in the best interest of their citizens, nor have the States surrendered to the Federal Government the State's police power to prescribe regulations to promote the health, peace, morals, education and good order of the people.

Section 4. *That the decisions of the Federal District Courts* in the State of Louisiana, prohibiting the maintenance of separate schools for whites and negroes and ordering said schools to be racially integrated in the cases of Bush v. Orleans Parish School Board, Wil-

liams et al. v. Jimmie H. Davis, Governor of the State of Louisiana et al., Hall et al. v. St. Helena Parish School Board, Davis et al. v. East Baton Rouge School Board, Allen et al. vs. State Board of Education, involving the Shreveport Trade School, and Angell vs. State Board of Education, involving five (5) other trade schools maintained and operated by the State of Louisiana, all based solely and entirely on the pronouncements of Brown vs. Topeka Board of Education, *are null, void and of no effect* as to the State of Louisiana, its subdivisions and School Boards and the duly elected or appointed officials, agents and employees thereof.

Section 5. That, as the lawful depository of State Sovereignty, the Legislature of the State of Louisiana, enacts this legislation to preserve and protect the powers reserved to the State of Louisiana and the people thereof by the Tenth Amendment to the Constitution of the United States, and that, since the usurpation asserted by this Act to have been committed by the Supreme Court of the United States and said Federal District Courts of Louisiana pursuant to the decision of the former in Brown vs. Topeka Board of Education, *it is not within the province of the usurpers to determine,* but can be determined only by the people through the amendatory process provided for in the Constitution of the United States, *the sovereignty of this State is interposed until such time as the said decision of the Supreme Court may become the law of the land by proper constitutional amendment,* notwithstanding the decision of any Federal court attempting to declare this Act unconstitutional.

Section 6. *That no governmental agency, judge, marshal or other officer,* agent or employee of the United States shall undertake or attempt the enforcement of any judgment, decree or order of any Federal Court, nor to make or attempt to make service of any citation, summons, warrant or process in connection therewith, predicated upon the United States Supreme Court's decision and decree in the case of Brown vs. Topeka Board of Education, *upon any officer of the State of Louisiana, or of any of its subdivisions,* agencies or School Boards, or upon any of their agents, employees or representatives in the maintenance of the public schools of the State, or who may be engaged in carrying out the provisions of this Act, or other law, right or power of the State of Louisiana under its reserved powers provided by the 10th Amendment to the United States Constitution.

Section 7. That this Act shall remain in effect only until such time as the Constitution of the United States may be amended by the process set forth therein to grant unto the Federal government the powers usurped by the Supreme Court of the United States in its decision of May 17, 1954, in the case of Brown vs. Topeka Board of Education, and other decisions of the Federal Courts pursuant thereto.

In the meantime, the State of Louisiana as a loyal and sovereign State of the Union will exercise the powers reserved to it under the Constitution to judge for itself of the infractions and to take such other legal measures as it may deem appropriate to protect its sovereignty and the rights of its people.

Section 8. That the people of this State feel, as they ever have, the most sincere affection for the people of the other States of the Union, and the most scrupulous fidelity to the Constitution which is the pledge of mutual friendship, and this Legislature solemnly appeals to the like dispositions of the other States, in confidence that they will concur with this State in declaring, as it does hereby declare, that the aforesaid decisions are unconstitutional, and that *the necessary and proper measures will be taken by each for cooperating with this State,* in maintaining unimpaired the authorities, rights and liberties, reserved to the States respectively, or to the people.

Section 9. *That any person who violates any provision of this Act shall be deemed guilty of a misdemeanor,* and on conviction thereof shall be fined not less

than $500.00 or more than $1,000.00 *and* imprisoned in the Parish jail for not less than six months nor more than twelve months, and no judge shall have the right or authority to waive or suspend said sentence.

Section 10. *That a copy of this Act be sent to* the Governor and Legislature of each of the other States of the Union, to the President of the United States, to each of the Houses of Congress, to Louisiana's Representatives and Senators in the Congress, and to the Supreme Court of the United States and to the U. S. District Court at New Orleans for their information.

Section 11. All laws or parts of laws in conflict herewith are *hereby repealed.*

Section 12. *The necessity for the immediate passage of this Act having been certified by the Governor* to the Legislature while in session, in accordance with Section 27 of Article III of the Constitution of Louisiana, this Act shall become effective immediately upon approval by the Governor.

Appendix B
Summary of Laws and Resolutions
Enacted by First Extraordinary
Session of 1960

*Act No. 1.** Provides for an appropriation of $168,000 to pay the cost of the First Extraordinary Session of 1960.

*Act No. 2.* The full text of this Act is attached hereto as Appendix A.

*Act No. 3.* Repeals Act 319 of 1956 which provided for racial classification by the legislature of public schools in cities with a population in excess of 300,000—i. e., New Orleans—and "froze" the segregated classification then existing. Act 319 was held unconstitutional on August 27, 1960.

*Act No. 4.* Repeals Act 542 of 1960 which provided that the Governor close any school in the state when its operation was threatened or disrupted by disorder, riots or violence, reopening to take place at the Governor's discretion. Act

542 was held unconstitutional on August 27, 1960.

*Act No. 5.* Repeals Act 496 of 1960 which provided for separate public schools for Negro and non-Negro students and vested the state legislature with the sole power to classify schools racially. A school board under a court order to desegregate was to be superseded by the Governor. Act 496 was held unconstitutional on August 27, 1960.

*Act No. 6.* Repealed Act No. 495 of 1960 which authorized the Governor to close all schools in the state if one is integrated and provided that school boards having jurisdiction of the closed schools could lease or sell the school facilities to private agencies. Act 495 was held unconstitutional on August 27, 1960.

*Act No. 7.* Repealed Act No. 256 of 1958 which authorized the Governor to close any school in the state ordered to integrate and, in that event, any or all of the other schools in the same parish. School boards having jurisdiction of the closed schools were authorized to sell or lease the school property to private agencies for private schools. Act 256 was held unconstitutional on August 27, 1960.

*Act No. 8.* Repealed Act No. 333 of 1960 which withheld, under penalty of criminal sanction, free school books, supplies, and all state funds from integrated schools. Act 333 was held unconstitutional on August 27, 1960.

*Act No. 9.* Repealed Act No. 555 of 1954 which required separate public schools for white and Negro children and prohibited the furnishing of free books, supplies or state funds to schools which violated the Act. The Act also prohibited the State Board of Education from approving secondary schools which violated the Act and state universities from recognizing diplomas from such schools, and provided misdemeanor punishment for violation of the Act. Act 555 was held unconstitutional on August 27, 1960.

---

* Acts 1 through 29 and House Concurrent Resolution 10 were all enacted on November 8, 1960. The date of subsequent measures is shown beside their titles.

*Act No. 10.* Permits Governor to close schools in case of disorder, riots or violence or to prevent disorder, riots or violence. Re-enacts Act No. 542 (repealed by Act No. 4) almost verbatim.

*Act No. 11.* Permits Governor to close any public school under court order "to carry on any program, plan or rule not consistent with the Constitution and laws of the state or State Board of Education policy, rules and regulations * * *" and any or all other schools within the parish. Similar to Act 256 of 1958 which was repealed by Act No. 7.

*Act No. 12.* Permits Governor to close all public schools in the state whenever any public school has been taken over as a result of a court order decreeing that a school board shall place into operation a plan or program "not consistent with the Constitution and laws of the state, or State Board of Education policy, rules or regulations." Similar to Act No. 495 of 1960 which was repealed by Act No. 6.

*Act No. 13.* Withholds, under penalty of criminal sanction, free school books, supplies, and all state funds from schools which are ordered to operate or which operate "under any plan or program not consistent with the Constitution and laws of the state or State Board of Education policy, rules or regulations * * *." Similar to Act 333 of 1960 which was repealed by Act No. 8.

*Act No. 14.* Requires that schools be operated "in accordance with the Constitution and laws of this State, and State Board of Education policy, rules and regulations." The Act also prohibits the State Board of Education from approving schools which violate the Act and state universities from recognizing diplomas from such schools, and provides misdemeanor punishment for violation of the Act. Similar to Act 555 of 1954 which was repealed by Act No. 9.

*Act No. 15.* Permits State Sovereignty Commission (established by Act No. 18 of the 1960 Regular Session) to employ legal counsel and fix compensation.

*Act No. 16.* Amends La.R.S. 40:1379, dealing with duties and powers of police employees of State Department of Public Safety by adding power to "keep the peace and good order in the state in the enforcemnt of the state's police powers," and provides that state police shall "perform any other related duties imposed upon them by the Legislature." Removes restrictions on state police acting within municipalities maintaining police force.

*Act No. 17.* Withdraws and suspends all powers and duties of Orleans Parish School Board, and vests them in the legislature. Makes certain school board employees subject to exclusive control of legislature and immunizes them from liability for acts required by the legislature.

*Act No. 18.* Provides for the appointment of a Board of Trustees empowered to take into custody all the funds of any school board ceasing to exist; such funds to be earmarked for the education of children previously under the jurisdiction of the formerly existing school board.

*Act No. 19.* Repeals La.R.S. 17:123 which designated the Superintendent of Public Schools of Orleans Parish as ex-officio treasurer of the School Board.

*Act No. 20.* Prohibits State Board of Education from approving or accrediting any school which is operated in violation of the Constitution and laws of the state, or State Board of Education policy, rules and regulations.

*Act No. 21.* Prohibits school boards and members from functioning when any school under their jurisdiction "shall have been ordered to carry on any program, plan, rule or regulation not consistent with the Constitution and laws of the state or State Board of Education policy, rules and regulations * * *"

*Act No. 22.* Requires local school board to close any school operated "in violation of the Constitution or laws of the state or State Board of Education policy, rules and regulations * * *" and permits school board to sell or lease closed or abandoned school property.

*Act No. 23.* Requires the State Board of Education or the State Superintendent of Education to revoke the license of any public school teacher who shall instruct a class "in violation of the Constitution and laws of this state or in violation of State Board of Education policy, rules and regulations * * *" and provides that "any principal, supervisor or superintendent who permits any teacher to teach such a class shall have his certificate likewise revoked for such cause, and his contract of employment terminated for malfeasance in office."

*Act No. 24.* Denies promotion and graduation credits to any pupil who attends class in any school "where the class has been made subject to any order not consistent with the Constitution and laws of the State or State Board of Education policy, rules and regulations * * *"

*Act No. 25.* Repeals La.R.S. 17:121 relating to the election and qualifications of members of the Orleans Parish School Board.

*Act No. 26.* Prohibits pupils from being transferred from the segregated schools to which they were assigned in September 1960 and makes it a misdemeanor for any member of a school board to consent to such transfers.

*Act No. 27.* Deletes from law provisions requiring compulsory school attendance.

*Act No. 28.* Similar to Act No. 23 except that it is applicable to teachers, supervisors and directors in state-operated trade and vocational-technical schools.

*Act No. 29.* Similar to Act No. 22 except that it is applicable to state-operated trade or vocational-technical schools.

*House Concurrent Resolution No. 10.* Delegates to an eight-man legislative committee full control of the Orleans Parish schools.

*House Concurrent Resolution No. 17, adopted November 13, 1960.* Withdraws from the eight-man committee appointed by the Legislature pursuant to House Concurrent Resolution No. 10, supra, the power to administer the New Orleans public schools and transfers control of these schools to the Legislature as a whole. Transforms the legislative committee previously appointed into an investigative body with the power to compel the attendance of witnesses and the production of evidence.

*House Concurrent Resolution No. 18, adopted November 13, 1960.* Ratifies all the action taken by the eight-man legislative committee, including its decision to repeal the resolution earlier adopted by the School Board approving the Superintendent's proposal to transfer the five Negro girls to formerly all-white schools. Also purports to fire Dr. Redmond as Superintendent of the Orleans Parish schools and Mr. Rosenberg as attorney for the Orleans Parish School Board.

*House Concurrent Resolution No. 19, adopted November 13, 1960.* Declares November 14, 1960, a school holiday throughout the state and directs the sergeants-at-arms of the Legislature (whose number may be increased without limit through appointment by the President of the Senate or the Speaker of the House) to prevent the opening of any school on that day. The sergeants-at-arms are also directed to deny school admission to any transferred student who does not have a certificate authorizing his transfer from the Legislature itself.

*House Concurrent Resolution No. 23, adopted November 14, 1960.* Addresses out of office the four members of the Orleans Parish School Board who obeyed the orders of this court by refusing to abandon their duties in compliance with Acts 17 and 25, House Concurrent Resolution No. 10, and House Concurrent Resolution No. 17, supra.