### SMALL, et al v. PINELLAS COUNTY SCHOOL BOARD, et al.
No. 16040.
Circuit Court, Pinellas County.
September 14, 1970.

N. David Korones of Phillips, McFarland, Gould & Korones, Clearwater, for the plaintiffs.

Edward A. Turville of McClure & Turville, St. Petersburg, for District School Board of Pinellas County.

Richard C. Peet, Washington, D.C., of counsel for Congressman William C. Cramer, intervenor.

Gerald Mager, Tallahassee, for Governor Claude R. Kirk, Jr., intervenor.

CHARLES R. HOLLEY, Circuit Judge.

*Final judgment:*

## INTRODUCTION

Once upon a time, in the days before the olden days, there was a great king who lived on an island. A son born to this king was name Revol.

The years passed and Revol grew to be a powerful, intelligent, but somewhat brash and wild young man. Revol and his father did not get along too well. So Revol decided to leave home.

Revol went west and took with him his young bride. They settled in a beautiful but wild country and went to work to clear it and make the land produce. Revol had many, many children. One son was named Sam and one was named Dix. All of Revol's children except Sam had many, many children. Sam was a big, powerful man who late in life took a young wife who bore him one fine son, Sam, Jr.

The years passed and Revol and his children grew bent from toil. Dix decided the family needed help and brought into the land some people from another family, said to be descendants of a man named Ham. Because the descendants of Ham were not of the same family, they owned no part of the land and were servants to the descendants of Revol. These children of Ham being unskilled and unfree were mostly tillers of the soil on great farms. In other areas of the land of Revol there were only a few descendants of Ham, and these areas did not have the great farms. In these other areas the descendants of Revol became merchants and craftsmen.

It came to pass over the years that in Revol's land there was a great plenty of good food, fine clothing, comfort and happiness, and Revol's descendants and the descendants of Ham became a multitude. In his part of the land Dix had trouble keeping up with and keeping separate all the children, grandchildren and great-grandchildren. Dix began keeping a family history for his family and another history for the descendants of Ham. In these books he put down names and birthdays and death days and parents and children and all kinds of things.

During all of this time the children of Revol were paying tribute to the old king on the island. There came a time when these children decided they would no longer pay tribute and would have their own king. Revol agreed, but he told his children he was too old and tired to be king. Sam had only his wife and son and not as much to do as the others and was powerful. So Sam''s brothers and sisters chose him king.

There came a time in the olden days when Sam decided it was not right for the descendants of Ham to be servants to Dix and his children. This upset Dix considerably. So Dix said that Sam was no longer his king, and he would not take Sam's orders. But Sam could not allow this; so he and Dix fought. Sam won.

After the fight, while Sam had Dix pinned to the ground, Sam and Dix and all their brothers and sisters made a covenant, written on stone with a mixture of blood from Sam's and Dix's wounds, that through all the length and breadth of the land of Revol, for the children of Revol, and for the children's children, and even unto the last generation of Revol, in the sight of the king all persons are equal.

Until this time the descendants of Dix had lived in the big house and the descendants of Ham had lived in the best places they could find. Sam ordered that they all live in the same house; that after this time the descendants of Ham have the same right to the land and the fruits of the land as the descendants of Dix.

The old, big house was not big enough. Sam ordered Dix to build a new house on Dix's land. Of course this had to be a very large house to take in all the tremendous multitude of the descendants of Dix and the descendants of Ham. Being a little older than Sam, Dix was wise in the ways of man and realized Sam would not hold a grudge because of their fight. Dix was sure that if he did as Sam said but did it in a way agreeable to Dix that Sam would approve it. So Dix drew a plan for the new house with broad foundations covering much land, an enormous house. This plan was for the house to be built in two parts, each part like the other. When he had his plans all ready, Dix gave them to Sam for approval. Having been king now for quite some time, Sam had lots of experience, and although Dix was older and quite wise in the ways of man, Sam understood perfectly what Dix was going to do. Dix did not have to explain to Sam that Dix was going to have his descendants live in one side of the house and the descendants of Ham in the other. Sam thought about it for awhile and then told Dix the new house would be all right as long as everyone lived under the same roof, and it would be all right to have separate parts under the roof as long as those separate parts were equal.

Dix built the new house.

Time passed again, and as the descendants of Ham multiplied and grew the descendants of Dix multiplied and grew. Dix decided it would be a good idea to have special rooms in the house for taking care of the little children. He first added a room on the ground floor for the little descendants of Dix. He then put a room above this for the little descendants of Ham. As time passed the children's rooms were not big enough and more rooms were added, some over other parts of the house, some on the third floor, some on the fourth floor. By this time the house had become enormous and large portions of it were used for the children in rooms scattered all over.

During the time all of this had been going on both Sam and Dix had given up the ghost and Sam, Jr. had become king and Dix's son, Pryde, had taken over his father's lands.

One day a little time ago a little child of a descendant of Ham went to Pryde and said the games in his room were not the same as the games in a room used by the children of Dix, besides his room had the afternoon sun and the other room had the morning sun. Pryde explained to him what Sam had said in the olden days. But this little child descendant of Ham was unhappy and went to see Sam, Jr. Sam, Jr. listened to the little child and brushed away his tears and, feeling sorry for him, sent his messenger to Pryde to come see him. Pryde put on his finest clothes and taking his wisest brothers with him went to see Sam, Jr. Sam, Jr. told Pryde of the complaint of the little child. Pryde reminded Sam, Jr. that Sam, Sr. had approved the original plans for the house. But Sam, Jr. was persuaded by the little child of Ham and told Pryde that he thought both of their fathers had made a mistake, that it was not fair to the little children of Ham for there to be separate rooms for them from those of the little children of Dix. Sam, Jr. told Pryde his father, Dix, had built the wrong house. Sam, Jr. ordered Pryde to tear down his enormous house of many wings and rooms and build another without having separate rooms for the children of Ham. Although Pryde was proudful and was convinced Sam, Jr. was wrong, he knew Sam, Jr. to be powerful and a fierce fighter and could beat him as Sam's father had beat his father.

Pryde returned to his enormous house and thought and thought and thought. While he was thinking his family grew and he added another room for the little children, this room to be used by the children of Ham and the descendants of Dix together. Pryde thought this might be enough to get by with Sam, Jr. as Dix had got by with Sam, Sr. Sam, Jr. heard about this new room and sent a message to Pryde that he had meant just what he said, and Pryde would have to tear down the whole mansion and build a new one. Sam, Jr. also told Pryde that he had sworn to his father, Sam, Sr., on his death bed that he would keep the covenant written in blood, that everybody was to be treated equally, and that when Pryde built his new house he was not to concern himself with whether those to be in any part of it or to share it were descendants of Ham or descendants of Dix. Sam, Jr. had his messenger tear up Pryde's family histories so Pryde would not know who descended from whom.

This tearing down seemed to Pryde to be a tremendous waste, so he went with his wise brothers from room to room of the house rearranging the children's rooms. He could not rearrange the living quarters because these had been assigned forever. And so when he got through rearranging the children's rooms it happened that a children's room surrounded by living quarters of the descendants of Ham remained as a room for the little children of Ham and a children's room surrounded by living quarters of descendants of Dix remained for the use of the little children of Dix.

When Sam, Jr. heard about this, he again sent for Pryde.

When Pryde arrived at Sam, Jr's. great white house, Sam, Jr. told Pryde his patience was exhausted. He sent Pryde home with an armed guard with directions to the Lieutenant of the Guard to carry out his order that everyone be treated equally. When the Lieutenant arrived at Pryde's enormous house he started to do what Sam, Jr. had said. The Lieutenant forced Pryde and his brothers to point out to him the descendants of Ham and the descendants of Dix and began to change the little children's rooms by making sure there were some of the little children of Ham in each of the little children's rooms. Pryde protested, he strongly objected, he said that Sam, Jr. had said that the covenant said he was not to pay attention to whether the little children were descendants of Ham or descendants of Dix, that Sam, Jr. had even made him tear up the family histories. But the Lieutenant said he did not hear anything like that in Sam, Jr's. order to him, and he kept on because he could not figure out how to carry out Sam, Jr's. order to treat all descendants the same unless he knew who descended from Dix and who descended from Ham.

And there the story ends, and this court's problems begin.

### Statement of the case and findings

This is a class action for declaratory judgment and other relief. The plaintiffs are children and taxpayer-parents of the children resident in the "five-school" area of Pinellas County. The primary defendant District School Board of Pinellas County, the members of the school board and Superintendent Southard are hereafter referred to as the "school board" except when expressly to the contrary. Leon W. Bradley, Jr. is a defendant but has never appeared although duly served with process. One intervenor is a member of the same class as plaintiff but taking the opposite view. The other intervenors are the Honorable William C. Cramer, Member of Congress, and the Honorable Claude R. Kirk, Jr., Governor of Florida.

In May, 1964 a class action was filed by Leon W. Bradley, Jr., a negro, in the United States District Court for the Middle District of Florida, case no. 64-98-Civ.T., to require the desegregation of the public school system of Pinellas County. As a result of that suit various and sundry plans were filed with the district court. On March 6, 1969 the federal district court directed the school board

to file a new plan of desegregation, which was filed and which the court found to be unsatisfactory and on June 10 directed a new plan. The court specifically ordered the school board to reconsider its plan for desegregating Ridgecrest elementary school by

> "re-drawing the zone lines and transportation stops for Ridgecrest elementary, Mildred Helms elementary, Anona elementary and Fuguitt elementary schools, or by pairing Ridgecrest elementary with an elementary school within two miles, or any other promising course of action and method including a plan which the Florida School Desegregating Consulting Center at the University of Miami might submit to the defendant board."

The five-school area is that area of Pinellas County, and of the Pinellas County school system, which incorporates the geographical zones of Ridgecrest, Mildred Helms, Oakhurst, Fuguitt and Largo Central elementary schools, grades one through six (and a kindergarten operated at Ridgecrest). These five school zones are located in a pattern so that it might be said the Ridgecrest school is central to the other four; Mildred Helms school is about 1.7 miles northwest of Ridgecrest school; Largo Central is about 2.5 miles northeast of Ridgecrest; Fuguitt is about 1.9 miles almost due east of Ridgecrest; and Oakhurst is about 3.8 miles southerly from Ridgecrest and 5.2 miles southwesterly from Fuguitt. (Anona elementary, not involved in this suit, is west of Ridgecrest.)

Ridgecrest elementary school was built after 1954 undoubtedly as a black, segregated school. At the commencement of the school year of 1969, referring only to grades one through six, these five elementary schools had anticipated enrollment of — Ridgecrest, 485; Mildred Helms, 789; Largo Central, 593; Oakhurst, 855; and Fuguitt, 720. All Ridgecrest pupils were black; all other pupils, except one black at Largo Central, were white.

As a result of the district court's June 10, 1969 order the school board considered various alternatives and finally at its meeting of July 25, 1969 adopted a five-school "clustering" plan as follows — grades one through four would be eliminated at Ridgecrest and Fuguitt; grades five and six would be eliminated at Mildred Helms, Largo Central and Oakhurst. The plan also contemplated working out the assignment of pupils so that 305 fifth and sixth graders would be transferred from Mildred Helms to Ridgecrest; 111 fifth and sixth graders would be transferred from Oakhurst to Ridgecrest; 163 fifth and sixth graders would be transferred from Oakhurst to Fuguitt; 133 first through fourth graders would be transferred from Ridgecrest to Oakhurst, 116 to Mildred Helms and 81 to Largo Central; 91 fifth and sixth graders would be

transferred from Ridgecrest to Fuguitt; 204 fifth and sixth graders would be transferred from Largo Central to Fuguitt; 197 first through fourth graders would be transferred from Fuguitt to Mildred Helms, 88 to Largo Central and 206 to Oakhurst. Each school ended up with about the same enrollment as it started, but this accomplished a racial distribution of 14.55% negroes in Mildred Helms, 14.45% negroes in Oakhurst, 13.33% negroes in Ridgecrest, 14.49% negroes in Largo Central and 13.39% negroes in Fuguitt.

A number of negro fifth and sixth graders living west of the Ridgecrest school would be bused past the fifth and sixth grades at the Ridgecrest school to the fifth and sixth grade school another 1.9 miles to the east at Fuguitt. The evidence in these proceedings does not show how many of the 91 fifth and sixth graders transferred from Ridgecrest to Fuguitt lived west of Ridgecrest, but we do know that all of them lived within one-half mile of Ridgecrest, and Ridgecrest was unquestionably the nearest appropriate school except for the sole purpose of transporting them to another school to achieve a racial balance. This made up the 13.39% negroes for Fuguitt and left seats to be filled by the bringing in of the white pupils from Oakhurst 3.8 miles away, thereby reducing the racial balance in Ridgecrest to 13.33% negroes.

The plan was prepared for the school board by a Mr. Gibson whose responsibility it was to do so. Mr. Gibson's entire testimony with relation to this matter can be summed up by quoting the following from the record —

> For the school year 1969-70, with reference to these five schools you were under court order to do something about the situation with reference to Ridgecrest school, is that correct? — Yes, sir.
>
> Now, my understanding of your prior testimony, Mr. Gibson, was that you took action to . . . affirmative action to dismantle the dual school system existing there, did you not? — Yes, sir.
>
> And taking such affirmative action to dismantle the school system there, it was your understanding that you were not merely to desegregate the schools, but had an affirmative duty to integrate them, is that correct? — (No response)
>
> As a part of dismantling the dual school system? — Yes.
>
> Now, it is my understanding, further, Mr. Gibson, that you redrew the zone lines and reestablished what would be the appropriate school for the purpose then of integrating those schools to achieve the final result of dismantling the dual school system, is that correct — We drew the lines for the purpose to desegregate pursuant to a court order.
>
> You did not answer my question. Read my question to him. — (Reporter reads the question back.) Yes, sir.
>
> In doing this, Mr. Gibson, it is my further understanding that it became necessary for you then to count the number of black people who would be attending any particular school and to count the number of white people, is that correct? — Yes, sir.

And as part of this, you discovered that it would then be necessary to rearrange the transportation system to accommodate the racial distribution which you determined to be appropriate for the purpose of achieving the result required by Judge Lieb? — Yes, sir.

And it was also determined by you, and you recommended to the school board this particular plan, because it achieved approximately the same percentage of negroes in each of the five schools rather than a prior plan which had been considered and adopted by the school board, which would not have had that particular result? — That is right.

And that you felt that this particular plan, because of achieving an approximation of thirteen, fourteen, fifteen percent of blacks to whites in each of these schools would have a more long range result of integration and of dismantling of the school system than would have the other plan which you had previously considered? — Yes, sir.

And in doing this you took into consideration the question of white flight, is that correct? — Yes, sir.

I find the school board consciously and wilfully rearranged the school structure for these five schools and rearranged the assignment of pupils and rearranged the transportation system with respect to these schools by taking into account the race or color, black or white, of the pupils involved for the purpose of achieving integration of the five schools with a racial balance for each of the schools comparable to that for the total of the schools involved. I find that of the 3,442 children in the five schools 1,695 were assigned to a school other than the nearest appropriate school solely to achieve a racial balance. Even conceding the validity of the grade changes for the five schools, I find that 91 of the black pupils and 111 white pupils were assigned to a school other than the nearest appropriate school solely to achieve such racial balance.

I find this reassignment plan increased the costs of the operation of these schools in an undetermined amount and increased the costs of the operation of the school transportation system with respect to these schools in the amount of approximately $12,000 per annum.

I find there was no increased danger of physical injury to the pupils by reason of this reassignment plan over the prior plan of operation of these schools except for the additional mileage of transportation of pupils. It is clear from the testimony that it is safer to transport children to school than it is to have them walk only two blocks.

I find this reassignment plan caused considerable inconvenience and loss of time to those pupils who were transferred out of their prior zones and schools to other schools as contrasted with those of the same grade level allowed to remain. There is no distinction made here between black and white persons.

This plan was presented to the federal district court by the school board, the defendant in that case also. With respect to this plan it

was a totally non-adversary proceeding. A federal district judge approved this plan and went on to say — "The court holds that the Largo plan does not violate the constitutional rights of anyone, white or black."

The plaintiffs in this suit promptly filed this suit and also sought to intervene in the federal district court. The intervention in the federal district court was denied, but this court took jurisdiction. It will be noted that among defendants named in this proceeding is the person nominally party-plaintiff in the federal proceedings.

The nominal parties-plaintiff in this suit are black, but that fact has no real relevance to these proceedings.

The original complaint requested a temporary injunction which was issued on the basis that the plan violated Florida law constitutional on its face which had not been brought to the attention of the federal court and the federal court had not ordered the plan be carried out but merely approved it. The federal court promptly amended its order to direct the plan be carried out, and I promptly quashed my injunction sua sponte. An amended complaint was filed.

Various motions were filed in this suit by the school board and one of the intervenors. It was conceded by everyone that this court has jurisdiction from the viewpoint the complaint states a cause of action under the laws of Florida; the question was whether this court should proceed in view of the questions raised and relief sought. This court determined to proceed on the basis that it was appropriate under the decisions of the United States Supreme Court in Erie v. Tompkins,[1] Leiter Minerals, Inc. v. United States,[2] Hansberry v. Lee, [3] and Steele v. Louisville & Nashville R. Co.[4] It is my understanding that under the *Hansberry* case it would have been a denial of due process of law not to proceed.

(Because of the volume of them, case and other citations and explanatory footnotes are set out in numerical order in the attached "Footnotes" which are a part of this judgment. Italics throughout this judgment and opinion have been added by the court.)

The school board is continuing for the school year 1970-71 to carry out this five-school plan under order of the federal court entered August 6, 1970. The evidence shows there has been some but no substantial factual change in the situation since initiation of these proceedings.

It is claimed by plaintiffs the five-school plan violates the United States constitution, the Florida constitution, United States statutes and Florida statutes and regulations having the effect of law. The

plaint is the transportation of pupils under the plan as required or permitted by law is invalid because the operational plan for the schools is invalid.

### Opinion as to law
### Fourteenth amendment

Unquestionably it was the intention of the constitutional language that

"No state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the law,"[5]

to require of all non-federal governmental agencies equality as to persons with respect to race, color, religion or national origin. After the adoption of the fourteenth amendment following the war between the states, in 1896 in *Plessy*[6] the United States Supreme Court ratified what came to be known as the "separate but equal" doctrine. *Plessy* simply held that the fourteenth amendment did not prohibit governmental segregation because of skin color. The United States Supreme Court put its official stamp of approval on a blueprint for action by the states.

At the time of the fourteenth amendment, few people, if any, would have thought probably the major problem thus far faced by this country with respect to the question of racial discrimination would involve the public school system. Public school systems as we know them did not then exist.

The general welfare first dictated that public schools be provided for the purpose of assuring everyone who would or could take advantage of them the opportunity to be literate and understand mathematics. The scope of the public school was gradually broadened through the years to keep pace with the growth of the general welfare; as knowledge and material wealth increased, the citizens more and more transferred to public schools the educational responsibilities of the family. What the father learned following his father in the furrow, the son learned in vocational education. What the mother learned in helping her mother make clothing for the family, the daughter learned in home economics. From providing reading, writing and arithmetic and practical training in the art of everyday living, our citizenry has required the public schools to go into the cultural areas of music, painting and the art crafts generally, and even into such esoteric things as driver education.

We have gone from the day of the private solicitation of funds to hire a school master to probably the major part of the budgets of state and local government being applied to our public schools, colleges and universities.[7]

Irrespective of the wisdom of having the mandatory, mass education system which we do have, it is the decision of our people that it be. Our Florida constitution specifies —

"Adequate provision shall be made by law for a uniform system of free public schools . . ." [8]

During the infancy and period of tremendous growth and expansion of the public school system, "separate but equal" was the law of the land. And in the southeastern United States "separate but equal" was implemented in many and diverse applications. Probably the most critical application of the law of the land was the creation of a separate school system for blacks (The District of Columbia segregated system was noted by the court in *Plessy.*) It is essential to remember the segregated "black" schools were created in implementation of this "separate but equal" doctrine. The "white" schools were not created as segregated schools. Many non-whites attended the "white" schools. Generally speaking, persons of Oriental, Asiatic, Pacific and Indian ancestry, of skin tones from very dark brown to bright yellow, attended the "white" schools and were prohibited from attending the segregated "black" schools.[9] These are historical facts which are set out here to point up that of the segregated dual school system in the southeastern United States, and particularly in Florida, the segregated portion of the system was the "black" schools.

In 1954 in *Brown I*[7] the United States Supreme Court destroyed the doctrine of "separate but equal" which had been applied to create the segregated school system in the southeastern United States. The court adopted the arguments rejected in *Plessy.* Segregation was outlawed. This new interpretation of the fourteenth amendment was then applied to trespass convictions,[10] seating in courtrooms,[11] restaurants in public buildings,[12] bus terminals,[13] and state fair employment practice laws.[14] As in this respect the due process and equal protection clauses of the fourteenth amendment apply to the states, the due process clause of the fifth amendment requires the same of the legislative, executive, and judicial arms of the federal government.[15,16,17] Because the United States and Florida constitutions are substantially identical on "equal protection" and "due process" there will be no discussion of the Florida constitution as to these in this opinion. (See notes 7 and 16.)

Beginning with *Brown II*[7] the Supreme Court of the United States held that those states which had created the segregated school system over the decades with the understanding that such system was permissible under the Supreme Court's "separate but equal" doctrine had in fact acted illegally and unconstitutionally and therefore were bound under principles of common law equity

to take action to eliminate the dual school system, in other words, to take action to eliminate the segregated system.[18] Even though this system had been created during half a century of good faith reliance upon the blueprint approved by the Supreme Court of the United States, this did not relieve the states of eliminating what had been created.[19] In case after case this affirmative duty to eliminate was developed by the Supreme Court to require the states to scourge every root and branch of the system [20], to eliminate the segregated system forthwith.[21]

Under the Supreme Court decisions those states with *de jure* segregated school systems had and have two duties. One duty is the common law requirement to eliminate the segregated system. The other duty is the constitutional requirement that any school system conducted in the future be a "unitary" system.

As to the system to be conducted in the future there is no particular legal problem. The public school systems operated by the states and the federal government must under no circumstances take into consideration the race or color of the people involved. With respect to this the United States Supreme Court has very carefully stated that freedom of choice,[20] demographical and geographical considerations and freedom of transfer [22] do not violate the constitution. In no case has the Supreme Court suggested any school system is required to be designed to promote integration. As was stated by the Supreme Court in *Alexander*,[23] the unitary school system, if any,[24] which is to be operated by a governmental agency is one

> "within which *no person* is to be effectively excluded from any school because of race or color." [25]

This constitutional duty yields to nothing.[26] All other considerations appropriate to the location and operation and conduct of a school system are permissible.

The problem is the affirmative duty to eliminate. Obviously this must be disposed of before any unitary system can be created. While any root or branch of the segregated system exists actions with reference to the operation of a unitary system are insufficient.[18] So the first problem is to eliminate. By creating this affirmative duty to eliminate the court has posed a dilemma. In *Northcross*,[27] the most recent expression by the Supreme Court, in a special concurring opinion Mr. Chief Justice Burger said that the court as soon as possible

> "ought to resolve some of the basic *practical* problems when they are appropriately presented including whether, as a *constitutional matter,* any particular *racial balance* must be achieved in the schools; to what extent school districts and

zones *may* or must be altered as a *constitutional matter;* to what extent transportation *may* or must be provided *to achieve the ends sought by prior holdings of the Court."*

The problem can be stated in very simple words — having determined that a segregated system exists, it being constitutionally impermissible to take into consideration color or race in taking action to eliminate the system, what action may be taken?[28] It is permissible to look at the race or color to determine that the segregated system exists;[29] it is permissible to look at the race or color to determine that the segregated system has or has not been eliminated;[20, 21, 22] but it is impermissible to look at race or color in taking action to eliminate the system.

> "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities. * * * The Constitution confers upon no individual the right to demand action by the state which results in the denial of equal protection of the laws to other individuals."[30]

It is impermissible to determine that you have so many blacks in one school and so many whites in another school and you are going to order the transfer of a particular number of blacks from the "black" school and a particular number of the whites from the "white" school. This is excluding whites from the "white" school because of color and blacks from the "black" school because of color.[31]

A severe practical problem, a severe educational problem which has disturbed conscientious, law-abiding school boards, as it has in this case, is the necessity of eliminating the dual, segregated system at the same time it is creating the unitary system.[32]

### Civil Rights Act of 1964

Section 5 of the fourteenth amendment to the United States constitution states that —

> "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

As relates to the question of school desegregation, on July 2, 1964, after extremely lengthy debate, congress passed and the president signed into law the Civil Rights Act of 1964.[33] It is clear that once the "power to enforce" of the constitution is exercised by the congress the courts are bound to comply unless the congress has violated the constitution.[34]

When the Civil Rights Act of 1964 was submitted to the congress by the president and as introduced by Congressman Celler, chair-

man of the committee on judiciary, title III, relating to "Desegregation of Public Education," contained, in addition to desegregation provisions, considerable language with respect to racial balance in school systems.[35] During the course of hearings on title III, questions were repeatedly directed to witnesses in an effort to ascertain what the term "racial balance" as used in the bill actually meant.[36] The subcommittee met in executive session for seventeen days to consider the whole bill, completely re-wrote the bill and in place of the proposed title III submitted a title IV which eliminated all references to racial balance. The full judiciary committee adopted a substitute substantially the same as the subcommittee's proposal.[37]

Title IV was considered on the floor of the house of representatives on February 6, 1964. Eight amendments were proposed, and two were adopted. Of particular moment was one offered by Congressman Cramer[38] providing in the definition in §401(b) that desegregation

"shall not mean the assignment of students to public schools in order to overcome racial imbalance."[39]

The bill went to the senate on February 10, 1964 and was debated for a precedent-smashing eighty-three days. Because of grave reservations by senate members several clarifying amendments were demanded. There was inserted in §407, with reference to the language granting jurisdiction to the lower federal courts to entertain proceedings brought by the commissioner under the Act, the following —

". . . provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards."

Since "existing power" as asserted by the courts at the time comprehended only ending segregation in the schools, not promoting integration, congress sought to make it crystal clear that no enlargement of that authority was contemplated by the Act. The congress rather than the court would set the guidelines for desegregating public schools.[40]

Not only is it clear from the legislative history that the intent of the congress is that federal agencies, acting under and with respect to the Civil Rights Act, have no authority to achieve desegregation through racial balancing, it is also clear both houses

of the congress, and, by the president's signing this legislation, the executive branch of the federal government, as a necessary precondition to the wording of the definition of "desegregation" and the most peculiar wording of the proviso in §407, determined that no governmental agency, state or federal, has any power to assign any pupil to any public school to achieve any racial balance.

Consider the peculiar language contained in §407 above quoted. It has been said by some of the lower federal courts this language was not intended by congress to restrict their authority. It is quite true this language does not expressly restrict the authority of the federal courts except as may relate to a suit brought directly under this Act. Let us assume arguendo, these courts are right, and this language has no application to suits filed by individuals and others for desegregation under the fourteenth amendment. Then what does the language mean? It is then absolutely meaningless. If a federal court has power other than under the Act to order the transfer of pupils to achieve racial balance to insure compliance with constitutional standards, then for the congress to say it is granting no such power under this Act becomes merely words without substance. In putting this language into the Act the congress was necessarily declaring that the courts of the United States have no power to order the transfer of pupils to achieve racial balance. This is obvious without any consideration whatever to legislative history. This is a necessary implication of the language used. It is the universal rule that that which is necessarily implied from the express terms of a statute is as much a part thereof and is as effectual as that which is expressed.[41] This language must be read to say —

> "[The officials and courts of the United States now having no such power] nothing herein shall empower any official or court of the United States . . ."

And this is a congressional determination that the equal protection clause of the fourteenth amendment prohibits such action by the federal courts and other federal agencies.

If carrying out the affirmative duty to eliminate the segregated system is a constitutional duty, the courts might well ignore this congressional declaration in exercising the jurisdictional power conferred by the constitution,[42] but this affirmative duty springs (if at all) from the common law. And this common law equitable duty is subservient to the acts of congress. (See note 18, supra.) It follows as daylight after dark that the federal courts, and this court,[43] are bound by this legislative restriction on their powers unless the statute is unconstitutional. But as has been demonstrated above, the congressional declaration is completely consistent with the constitution.

*Florida statutes and regulations*

The Florida constitution specifies

"adequate provision shall be made by law for a *uniform system* of free public schools . . ."[8]

Florida statutes and regulations implementing this constitutional mandate are voluminous. Those statutes and regulations having a direct bearing on this case which have been brought to my attention are set forth in the footnotes.[44]

§230.03(2), Florida Statutes, empowers the school board to establish and administer public schools within the district. This power is not absolute but must be exercised in accord with the constitution and laws of Florida and the United States constitution. The board is an administrative agency of the state designed to facilitate the administration of the state public school system and has no power to create and put into effect programs and plans inconsistent with law. Nor may the board attempt to circumvent the will of the legislature by doing indirectly what it cannot do directly.

The five-school pairing plan violates §228.13, Florida Statutes. §228.13 is the legislative interpretation, determination and compliance with the mandate of our constitution for a "uniform system." The legislature has itself so said. §230.03 of the statutes did not give the board discretionary power to create elementary schools with grade levels one through four or five and six, but requires the board to establish elementary schools where necessary with grades one through six or grades one through eight.[45]

This initial attempted extension of power by the board led to further violation of Florida law. §230.33(10) gives the board the power to ascertain which pupils should be transported to established schools, and §230.33(8) vests the board with the power to carry out pupil transportation as is necessary. Chapter 234 deals specifically with implementation of the powers given to the board in chapter 230 as relates to the transportation of school children. §234.01 sets forth the purposes of providing transportation.[44]

In establishing the five-school pairing plan the board has used the buses to achieve racial balance, a purpose not listed in §234.01. Adequate educational facilities and opportunities were available to the students involved in the five-school area without clustering of schools and massive busing. The five schools involved were used for grades one through six prior to the clustering plan. It is clear that but for the artificial and illegal shifting of grades these schools would provide adequate educational facilities and opportunities,

and in fact the schools are still being used. The purpose for which the transportation of pupils is being used is not within the purposes set forth in §234.01.

The most effective, economical and safe means of transporting school children is to transport them to the nearest appropriate school. And this is what our law requires. The nearest appropriate school is an elementary school with grades one through six, not grades one through four or five and six. The board is required to establish attendance areas for the schools, and those falling within the attendance area of one school go to that school. As the testimony clearly showed, the board created artificial attendance areas to create artificial nearest appropriate schools. In the five-school area, one attendance area covers two school zones. This is artificial and improper and an attempt to do indirectly what cannot be done directly. Such a classification results in school children being bused over school zone lines in order to reach what the board terms the nearest appropriate school when the nearest appropriate school is actually the school whose zone the children have been bused through or out of. The testimony of the school officials was to the effect that an attendance area could be established to include the entire county while children are transported to schools in accordance with sub-classifications of school zones; obviously this was not the intention of the statutes and regulations. Using state funds to transport 1,695 pupils to other than the nearest appropriate school is in violation of Florida statutes and regulations.

The expenditure of state or local funds with reference to the 1,695 pupils who were reassigned for the sole purpose of achieving a racial balance is prohibited by §30, chapter 70-95, Laws of Florida.[44] This statute uses the word "solely." It is clear from the evidence in this case that if ever governmental action was for a single purpose this is the case. There is no evidence of any other reason. But it is my opinion the word "solely" as used in the statute must be applied with reason. There are no absolutes in human affairs. Even when action is by a sole person, to assign a literally sole reason for such action defies all understanding of human nature. Group (school board) action is never solely motivated. To apply the word "solely" absolutely literally would render the statute meaningless, a result to be avoided unless compellingly required. The rule of reason I apply to "solely" in this statute is — but for the statutorily described considerations or purposes the action would not have been taken, and no other consideration or purpose contributed substantially to producing such action.

Although there has been no direct attack on the constitutionality of these statutes and regulations, it has been argued by an inter-

venor that they must yield to the constitutionally required, affirmative duty to integrate espoused in *Jefferson* (see note 31). To the contrary, I hold these statutes, as particularly below specified, are valid, constitutional exercises of the legislative power of Florida and the common law, equitable duty to eliminate the segregated system imposed by the United States Supreme Court must be carried out in a manner consistent with them.

There is no conceivable basis of conflict, either on its face or in any application, between §228.13, as I have interpreted it, and the United States constitution. And except for a vague *Jefferson* argument, no basis of unconstitutionality has been advanced. This is also true of §§230.23(8) and 234.01 and rules 130-3.01(1)(a), 130-3.10(1) and 130-3.10(3).

I make no ruling with respect to the constitutionality of rules 130-0.179 and 130-0.180. Although portions of these rules are completely consistent with my understanding of the law, I have some doubts with respect to other portions.

§30, chapter 70-95, Laws of Florida, is plainly and patently constitutional. It simply says with reference to our schools that no money shall be spent for the purpose of violating the equal protection clause of the fourteenth amendment and the similar language of our Florida constitution. I also hold my interpretation and application of this statute in this case violates no provision of the Florida or United States constitutions.

None of these statutes or regulations has been ruled unconstitutional either expressly or impliedly. Counsel for the school board has informed this court the several Florida statutes and regulations have never been argued or considered by the district or circuit federal courts in the Bradley litigation. Of course chapter 70-95 became effective only in July, 1970. Furthermore, to have either expressly or impliedly ruled these laws unconstitutional would have required convening a three-judge federal court for that purpose,[46] and this has never been done.

## Conclusion

This court has jurisdiction of the parties and the subject matter. The five-school plan as adopted by the school board and ordered by the federal district court and court of appeals violates the United States constitution, violates the Florida constitution and violates several constitutional Florida statutes and regulations. The ordering of this plan by the federal courts was in violation of the Civil Rights Act of 1964, the pertinent provisions of which are constitutional.

## Relief

It remains only to consider what relief can be granted.

The school board is under a duty declared by the Supreme Court of the United States to remove every vestige of the segregated system, such segregated system in this case being represented by the black, segregated school, Ridgecrest. In complying with this court-imposed duty, the board may not take action similar to that taken here which requires it to count its pupils by color to determine what to do. Any "pairing" or "clustering" plan requires such unconstitutional counting. Furthermore, in this case any "pairing" or "clustering" plan would violate the Florida statutes. This court may not order any plan in violation of the United States constituion, Florida constitution, Civil Rights Act or valid Florida statutes.

Applying the applicable law to the Supreme Court's imposed duty, the only lawful solution known to this court is to eliminate Ridgecrest as an elementary school.[47] This does not mean that Ridgecrest may not be used by the school board for special education or similar special purposes under a unitary system in which no person is either included or excluded because of race or color.

In the opinion and order of the United States Court of Appeals for the Fifth Circuit, case no. 28,639, Leon W. Bradley, Jr., et al, v. Board of Public Instruction of Pinellas County, et al, entered July 29, 1970, and the final order of the United States District Court, Middle District of Florida, Tampa Division, case no. 64-98-Civ.T., Leon W. Bradley, Jr., et al, v. Board of Public Instruction of Pinellas County, et al, entered August 6, 1970, the five-school plan under consideration in this case was *ordered* by the federal courts to be carried out for the school year 1970-71. The district court further ordered that all future school construction, school consolidation, site selection, location of temporary classrooms in the system be carried out in a manner to prevent the recurrence of the segregated system and retained jurisdiction of the suit for the purpose of enforcing its order and insuring that the Pinellas County school system continues to be operated in a constitutional manner. No authorities need be cited for the proposition that it would be highly improper for this court of concurrent original jurisdiction with the federal district court to order anything done by way of a mandatory injunction or otherwise in conflict with the order of the federal district court. It is also noted with respect to this that under article III and the supremacy clause (article VI) of the United States constitution the congress of the United States has empowered the federal courts to enjoin action by state courts when required for the purpose of preventing interference with the orders and judgments and jurisdiction of the federal courts, and should

this court attempt to interfere undoubtedly and quite properly it would be forthwith enjoined.

Also under the principles laid down by the United States Supreme Court [21] it would be a denial of equal protection of the laws to order closed any schools in Florida without adequate provision for these pupils while Florida is providing schools for other pupils.

It follows that under present circumstances action ordered by this court cannot be effective as to the pupils in these schools until conclusion of the 1970-71 regular school year. Also, such action must be designed and calculated to provide for adequate educational opportunities for these children under a unitary system consonant with Florida law.

Plaintiffs are entitled to such affirmative relief as this court can accord them under the circumstances.

### Judgment and order

It is thereupon adjudged and ordered —

(1) The five-school plan for the operation of that part of the Pinellas County school system which includes Ridgecrest, Mildred Helms, Oakhurst, Fuguitt and Largo Central elementary schools, grades one through six, and the transportation system for pupils with respect thereto, adopted by the district school board of Pinellas County, and ordered by the federal district court for the school years 1969 through 1971, violate the constitution of the United States and the constitution of the state of Florida, violate Florida Statutes, §§228.13 and 234.01, and, as ordered by the federal courts, violate the Civil Rights Act of 1964.

(2) This court is informed the decision of the United States Court of Appeals for the Fifth Circuit in case no. 28,639, Leon W. Bradley, Jr., et al, v. Board of Public Instruction of Pinellas County, et al, rendered July 29, 1970, has been taken by the school board to the United States Supreme Court on petition for certiorari on grounds in many respects similar to the conclusions of this court. The school board is commended for this action and is directed to continue with all procedures available to it to obtain review and reversal of the court of appeals' decision.

(3) The individual members of the district school board of Pinellas County, and Thomas Southard, as superintendent of public instruction, have acted in good faith and under coercion and compulsion of the federal courts and in no way are personally liable.

(4) Upon conclusion of the current 1970-71 regular school year the district school board of Pinellas County is ordered and directed to close Ridgecrest elementary school as a regular elementary school.

(5) The district school board of Pinellas County is ordered and directed to forthwith prepare and present to this court within thirty days a plan for the assignment of pupils for the present geographical areas of Ridgecrest, Mildred Helms, Oakhurst, Fuguitt, Largo Central and Anona elementary schools to be put into effect for the regular school year commencing in 1971. In preparing such plan the board is mandatorily enjoined from in any way under any circumstances taking into consideration the race or color of any prospective pupil.

(6) The plan for the 1971-72 school year must be consistent with applicable state laws, including those relating to the transportation of pupils.

(7) The plan presented by the district school board of Pinellas County may take into account schools and geographical areas in addition to those above specified, and the board may also present plans with reference to additional facilities to be constructed and provisions with reference to financing such additional facilities. It is the intention of this court to cooperate to the fullest extent with the board to assure that all pupils have made available to them educational facilities and opportunities of a superior character reasonably within the ability of the taxpayers to provide and only as limited by Florida law, such facilities and opportunities to be available to all such pupils without any element whatever of consideration of race, color, national origin, ethnic group or religion.

(8) The court has considered staying the operation of this order pending appeal by any party. In the event at any time in the future it should appear any party would be aggrieved by lack of stay pending appeal, which I do not foresee, a stay order will be entered ex parte.

(9) Jurisdiction is retained for the purposes of enforcing and implementing the executory portions of this judgment and consideration of changes justified by any changes of circumstances.

## FOOTNOTES

1. Erie v. Tompkins, 304 U.S. 64, 82 L.ed.1188, 58 S.Ct. 817, 114 ALR 1487.

2. Leiter Minerals v. United States, 1 L.ed.2d 267, reh.den. 1 L.ed. 2d 560.

3. Hansberry v. Lee (1940), 311 U.S. 32, 85 L.ed.22, 61 S.Ct. 115, 132 ALR 741.

4. Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 89 L.ed.173, 65 S.Ct. 226.

5. Fourteenth Amendment, Constitution of the United States.

6. Plessy v. Ferguson, 163 U.S. 537, 41 L.ed.256, 16 S.Ct. 1138.

7. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.ed.873, 38 ALR 2d 1180, supp.op. (Brown II) 349 U.S. 294, 99 L.ed.1083, 75 S.Ct. 753.

There can be no difference between the United States and Florida Constitutions on this. Article I, Section 2, Florida Constitution of 1968, says:

"All natural persons are equal before the law . . . No person shall be deprived of any right because of race . . ."

8. Article IX, Section I, Florida Constitution.

9. Of course, in other parts of this country there were different applications where segregation was practiced as the law of the land. Texas today has the problem of "desegregating" its "Mexican," "negro" and ·"white" schools.

10. Peterson v. Greenville (1963), 373 U.S. 244, 10 L.ed.2d 323, 83 S.Ct. 1119.

11. Johnson v. Virginia (1963), 373 U.S. 61, 10 L.ed.2d 195, 83 S.Ct. 1053.

12. Burton v. Wilmington Parking Authority, (1961), 365 U.S. 715, 6 L.ed.2d 45, 81 S.Ct. 856.

13. Boynton v. Virginia (1960), 364 U.S. 454, 5 L.ed.2d 206, 81 S.Ct. 182.

14. Colorado Anti-Discrimination Com. v. Continental Air Lines, Inc. (1963), 372 U.S. 714, 10 L.ed.2d 84, 83 S.Ct. 1022.

15. Hirabayashi v. U.S., 320 U.S. 81, 87 L.ed.1774, 63 S.Ct. 1375.

16. Bolling v. Sharpe, 347 U.S. 497, 98 L.ed.884, 74 S.Ct. 693.
Amendment V of the United States Constitution says: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . ." Article I, Section 9, Florida Constitution of 1968, says: "No person shall be deprived of life, liberty or property without due process of law . . ."

17. United States v. Romano, 382 U.S. 136, 15 L.ed.2d 210, 86 S.Ct. 279.

18. This involves consideration of *the de facto* and *de jure* segregation razzmatazz. There is no duty to desegregate *de facto* segregated schools, although there is a duty to operate a unitary school system where a *de facto* segregated situation exists. *De facto* segregation is that which comes about through the voluntary actions of the individuals concerned. *De jure* segregation is that which came about by governmental sanction either express or actual. After swallowing whole the idea (with which I do not agree but must accept) the governments involved are at fault for following the *Plessy* blueprint, I subscribe to the idea that there is a difference between a *de facto* situation and a *de jure* situation with *de jure* carrying an affirmative duty to first eliminate the segregated system then secondly operate a unitary system. This duty to eliminate is merely an application of a generally accepted, equitable principle firmly rooted in the law.

A simple analogy makes this clear. A contractor is engaged to build a particular house on the property owner's lot. A house is built, but this house is completely different from the house which should have been built. The property owner sues the contractor and obtains a judgment that the contractor has acted wrongfully and must build on the lot the house he contracted to build. Obviously, to fulfill his contract the contractor will also be ordered to remove at his own expense, whatever it may be, what he has wrongfully built. And until he removes what he wrongfully built he cannot erect what he should. (To make this analogy exact it would be necessary to add that the builder had been furnished by the property owner with the wrong plans but nevertheless the court ruled for the property owner.)

It is important to note at this point that law generally falls into three categories in this country: (1) at the bottom of the list is common law, (2) above the common law is statutory law, whether state or federal, and (3) above the statutes are the several state and the federal constitutions, in that order. The state statutes and the state constitutions are subservient to the federal constitution and the Acts of Congress pursuant to the delegated powers. This will be particularly adverted to later in this opinion with reference to the Civil Rights Act of 1964.

The point noted here is that this duty to eliminate is subservient to the requirements and prohibitions of applicable statutes and the constitution.

Agreeing with the distinction between *de jure* and *de facto* segregation is something entirely different from agreeing that all all-black schools were *de jure* segregated schools in jurisdictions, such as Florida, which prior to 1954 had segregation laws or policies. Certainly there is a presumption, if the school was created prior to *Brown I*, that the particular black school was created as a segregated school. The school board would be presumed to have complied with the law of the state as in states such as New York or Illinois the school board would be presumed to have complied with the state law to the contrary. There can be no such presumption for schools built after *Brown I*. Furthermore, there are many instances where schools were built in Florida prior to 1954 which as of *Brown I* were all-black schools purely because of housing patterns and not because of segregation law. On the other hand, there are numerous instances of schools in other states not having a segregation policy which were in fact built as segregated schools for the purpose of segregation. Also, today there are numerous all-black schools in Florida which were all-white schools at the time of *Brown I* and have become all-black since that time as a result of changing of housing; I have personal knowledge of an elementary and a junior high school which were attended by my son as integrated schools, which became integrated as a result of housing changes, and then became all-black as a result of housing changes. Incidentally, these two schools are now being ordered by the federal court to be desegregated when obviously they are not *de jure* segregated schools.

In summary, there is a presumption of *de jure* segregation as to any black school which existed prior to *Brown I*. Some pre-*Brown I*, all-black schools were not the result of *de jure* segregation. As to post-*Brown I* schools, there is a presumption against *de jure* segregation. Some post-*Brown I* schools were created under a policy of segregation, as in this case. Judicial inquiry must be made as to both pre- and post-*Brown I* black schools to determine whether the segregation is *de jure* or *de facto*. Only *de jure* black segregated schools are candidates for desegregation. Probably only those *de jure* segregated black schools which are barriers to the operation of a unitary school system require desegregation (see note 19 below).

19. This affirmative duty only applies as to public schools. As I see it, the rationale is: the equitable principle giving rise to the affirmative duty to "desegregate" is applicable to only those situations — school or otherwise — where past governmental action of segregation has erected a barrier to future "unitary" operations. If there is nothing standing in the way of the right, there is nothing requiring elimination. For example, the Supreme Court affirmed, over vigorous dissent, a lower court opinion holding there is no affirmative duty to eliminate the segregated system at the college level, the duty only being in the future to operate only a unitary system. Alabama State Teachers Association v. Alabama Public School and College Authority, 289 F.Supp. 784, aff'd, 393 U.S. 400, 21 L.ed.2d 631, 89 S.Ct. 681.

Within comparatively recent years there has come into being what is known as a class suit, and these school desegregation suits under consideration by the lower federal courts are class suits. Not only is it not necessary that there be a particular party in interest as plaintiff to one of these suits, but also the United States Supreme Court has held in effect in Raney v. Board of Education, 391 U.S. 443, 20 L.ed.2d 727, 88 S.Ct. 1697, that there need not be a justiciable question. The effect of this decision is to treat these class actions with reference to disestablishment of the segregated school system completely differently from any other type of law suit and set up the federal courts as super-school boards to provide "equal educational opportunity" through the courts. This lends some credence to the view taken in *Jefferson I* (see note 31). Under the view of this court, as will be shown, this is completely unnecessary to accomplish the mandate of the United States Supreme Court.

20. Green v. County School Board, 391 U.S. 430, 20 L.ed.2d 716, 88 S.Ct. 1689.

21. Griffin v. County School Board of Prince Edward, 377 U.S. 218, 12 L.ed.2d 256, 84 S.Ct. 1226.

22. Monroe v. Board of Commissioners, 391 U.S. 450, 20 L.ed.2d 733, 88 S.Ct. 1700.

23. Alexander v. Holmes County Board of Education (1969), 396 U.S. 19, 24 L.ed.2d 19, 90 S.Ct. 29.

24. James v. Almond (D.C. Va.), 170 F.Supp. 331, app.dism'd, 359 U.S. 1006, 3 L.ed.2d 987, 79 S.Ct. 1146.

25. Of course, "no person" means black or white or any other color. And of course a person included one place because of color is excluded from some other place. It is absolutely clear today it is the law of this land, as laid down by the United States Supreme Court and therefore binding on this court, that except possibly for Congress or the President exercising some unusual, expressly delegated constitutional power, no governmental agency, state or federal, judicial, legislative or executive, may take into consideration the color or race of any person in determining action to be taken with respect to that person at any time under any circumstances at any place for any purpose. Neither this court nor counsel for the two parties and three intervenors in this case has been able to find any expression by the United States Supreme Court to the contrary.

26. This constitutional duty must be accomplished irrespective of public hostility leading to violence, Cooper v. Aaron, 358 U.S. 1,20, 3 L.ed.2d 5,19, 78 S.Ct. 1401; Watson v. Memphis 373 U.S. 526, 10 L.ed.2d 529, 83 S.Ct. 1314; financial cost, Watson v. Memphis, supra; "white flight," Monroe v. Board of Commissioners, 391 U.S. 450, 20, L.ed.2d 733, 88 S.Ct. 1700.

27. Northcross v. Board of Education of Memphis, 25 L.ed.2d 246.

28. The plan will not be satisfactory if "racial segregation is the inevitable consequence," Goss v. Board of Education, 373 U.S. 683, 10 L.ed.2d 632, 83 S.Ct. 1405, or "it patently operates as a device to allow resegregation," Monroe v. Board of Commissioners, supra (note 22).

29. Obviously a court may make judicial inquiry to determine whether a governmental agency has previously taken action based upon race or color. The courts have two principal functions: to determine the facts; to apply the law to the facts. In most cases coming before the courts, whether jury or non-jury, there is a claim by the plaintiff that the defendant has wronged him. The plaintiff sets out certain facts which he claims are the wrongful acts of the defendant. Judicial inquiry is then made to determine whether these allegations are true. And so it is a court will look at race or color upon an allegation of a complainant that there has been governmental action taken with respect to him because of his race or color. But to inquire into the facts to determine a wrong can never justify the court in ordering a wrong, not even in "vindication of constitutional rights." We learned at our mothers' knees that two wrongs do not make a right. When a father refuses medical treatment for his sick child, I can order the treatment given, but however strong my feelings may be I cannot order the father be infected with the disease.

30. Shelley v. Kraemer, 334 U.S. 1, 92 L.ed.1161, 68 S.Ct. 836.

31. It will be noted in this opinion no opinions of the federal district courts or courts of appeal have been cited. One reason for this is the hopeless confusion and conflict in such cases (Compare Shuttlesworth v. Birmingham, 162 F. Supp. 378, that integration is not commanded, affirmed on narrow ground that plan good on its face, 358 U.S. 101, 3 L.ed.2d 145, 79 S.Ct. 221, with United States v. Jefferson County Board of Education, (1966) 372 F.2d 836, from the same circuit.); as a result they are not very persuasive. Secondly, I am of the opinion many of these cases are in direct conflict with the holdings of the United States Supreme Court, and this court must follow the law as enunciated by the United States Supreme Court. (Compare Bush v. Orleans Parrish School Board (D.C. La.), 188 F.Supp. 916, aff'd, 365 U.S. 569, 5 L.ed.2d 806, 81 S.Ct. 754, lower court opinion at page 925 that ". . . pending review by the Supreme Court, the decisions of the subordinate federal courts on constitutional questions have the authority of the supreme law of the land and must be obeyed.") Thirdly, I am of the opinion many of these decisions and orders by the lower federal courts are in direct violation of the due process clause of the Fifth Amendment and indirectly the equal protection clause of the Fourteenth Amendment. As was said in Shapiro v. Thompson, 394 U.S. 618, 22 L.ed.2d 600, 89 S.Ct. 1322, a state may not violate the equal protection clause, and "Congress may not authorize the states to violate the equal protection clause." No more may the courts.

Numerous of the orders of the lower federal courts have by express language ordered a lower court or the particular school authority to look at the race or color of a particular pupil to determine which school that pupil shall attend. The excuse given for this action by these courts is "to counteract the legacy left by the board's history of discrimination," United States v. School District 151 of Cook County, 404 F.2d 1125, or a classification reasonably related to a "proper governmental objective," United States v. Jefferson County Board of Education, (1966), 372 F.2d 836, or "to relieve racial imbalance if in their sound judgment such action is the best method of avoiding educational harm," Deal v. Cincinnati Board of Education, (1966), 369 F.2d 55, cert. den. 389 U.S. 847, 88 S.Ct. 39, 19 L.ed.2d 114.

But as courts may not order wrongful acts in other cases, the action which this court or any other state or federal court takes may not be based upon a person's race or color. The courts are as prohibited by the Constitution from basing action upon race or color as any other governmental agency. And it is particularly important that those agencies which are the final repositories of the rights of the people, the courts, comply with the law. In Cassell v. Texas (1949), 339 U.S. 282, 287, 94 L.ed.840, in his dissent, for other reasons, Mr. Justice Jackson said: "In setting aside this conviction, the court is moved by a desire to enforce equality in that realm where, above all, it must be enforced — in our judicial system." The Fifth Amendment to the United States Constitution prohibits any federal court, and the Fourteenth Amendment to the United States Constitution prohibits this court, from entering any order which takes into account, or permits or directs the taking into account by any governmental agency, the race or color of the person as to whom such order is operative. With the possible exception of the exercise of some express constitutional power under some unusual circumstance, in taking action no governmental agency may look at race or color.

The justification for this violation of the Constitution as set forth in Jefferson (United States v. Jefferson County Board of Education, supra) is faulty as to reason and specious as to authority. The opinion says that classification by race or color is permissible to carry out desegregation because it is reasonably related to a proper governmental objective; this objective is "to offer educational opportunities on equal terms to all . . . ;" the law imposes "an absolute duty to integrate, in the sense that a disproportionate concentration of negroes in certain schools cannot be ignored; racial mixing of students is a high priority educational goal . . ." which is required to provide equal educational opportunity which is guaranteed by the Constitution. *Jefferson* completely and totally failed to distinguish between the common law equitable duty to desegregate, to disestablish the dual school system, and the separate constitutional duty as to future operations of the school system. The *Jefferson* court said: "The Constitution is both color-blind and color-conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color-blind. But the Constitution is color-conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination. The criterion is the relevancy of color to a legitimate governmental purpose. For example, jury venires must represent a cross-section of the community. Strauder v. State of West Virginia, 1880, 100 U.S. 303, 25 L.ed.664. The jury commissioners therefore must have a 'conscious awareness of race in extinguishing racial discrimination in jury service.' Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1."

The *Strauder* citation of the *Jefferson* court is specious. The Supreme Court of the United States has positively, directly, affirmatively and unequivocally held that it is constitutionally impermissible to take action so that "jury venires must represent a cross-section of the community." The Supreme Court in *Strauder* very carefully and pointedly refrained from saying there must be a cross-section and said instead: "It is to be observed that the first of these questions is not whether a colored man, when an indictment has been preferred against him, has a right to a grand or a petit jury composed in whole or in part of persons of his own race or color; but it is whether, in the composition or selection of jurors by whom he is to be indicted or tried, all persons of his race or color may be excluded by law, solely because of their race or color, so that by no possibility can any colored man sit upon the jury." The Supreme Court of the United States said in 1949 and repeated in 1965 with reference to juries that: "Proportionate representation is therefore

forbidden. An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." Cassell v. Texas (1949), 339 U.S. 282, 287, 94 L.ed.840; Swain v. Alabama (1965), 380 U.S. 202, 208, 13 L.ed.2d 759. In a special concurring opinion in *Cassell*, Mr. Justice Frankfurter said: "The prohibition of the Constitution against discrimination because of color does not require in and of itself the presence of a negro on a jury. But neither is it satisfied by negro representation arbitrarily limited to one. It is not a question of presence on a grand jury nor absence from it. The basis of selection cannot consciously take color into account. Such is the command of the Constitution. Once that restriction upon the state's freedom in devising and administering its jury system is observed, the states are masters in their own household. If it is observed, they cannot be charged with discrimination because of color, no matter what the composition of a grand jury may turn out to be."

Nor has the Supreme Court restricted this language to juries: "Discriminations that operate to the disadvantage of two groups are not the less to be condemned because of their impact than if only one were affected." Henderson v. United States (1950), 339 U.S. 816, 94 L.ed.1302, 70 S.Ct. 843 (a railroad dining-car facilities case). Shelley v. Kraemer, (quoted in body of opinion, note 30 supra, state court enforcement of restrictive covenants based on race). See also Alexander v. Holmes County Board of Education, (note 23, supra).

I am unaware of any decision of the United States Supreme Court countenancing what was said in *Jefferson*. If the courts are permitted to look at a person's race or color for a legitimate governmental purpose, then would they not also be able to look at a person's religion, ethnic group or national origin? And would not the Jews, Moslems, Greeks and Japanese have the right to demand balancing? And it is particularly apt to consider that the very agency, the court, which is saying it may violate the Constitution for a legitimate governmental purpose is the same agency which has established the legitimate purpose.

I am aware of only one case in which the United States Supreme Court approved governmental action based upon race or color (except the cases based on *Plessy*). At the commencement of World War II, in December, 1941, by order of the head of the armed forces and upon the authority of the President and immediately ratified by Congressional Act, persons in the war zone which included the areas of the western part of the United States who were of Japanese ancestry were subjected to curfew and other regulations. Hirabayashi was convicted for violation of the curfew regulations. The Su- -preme Court sustained the conviction most reluctantly even though a direct exercise of the war power explicitly provided in the Constitution in an emergency situation and for a limited period of time. Hirabayashi v. United States, 320 U.S. 81, 87 L.ed.1774, 63 S.Ct. 1375.

To some this distinction between on one hand looking at the colors to determine that action must be taken and looking at colors to determine that the action taken is or is not sufficient, and, on the other hand, not looking at colors to determine what action must be taken might appear a sophistry, a distinction without a difference. Again reference is made to the house analogy. When the court determines the wrong house was built and orders it demolished the portions which were wrong and the portion which might fit what should have been built become irrelevant. When the contractor is told to tear it down his obligation is to tear it down. Judicial inquiry can be made to determine that the building has been demolished. The contractor then rebuilds. The inquiry after the rebuilding is not to determine whether he demolished but to determine whether he has built properly. Under the view of this court it is completely unnecessary to violate the Constitution to disestablish a segregated school system. Except for possibly the *Hirabayashi* type situation or for determining whether the law has been or is being violated, there is no legitimate governmental purpose for looking at a person's race or color at any time or under any circumstances.

Furthermore, although not relevant, the effect of these lower federal court decisions which I have observed is the gradual destruction of the public school system.

32. Again referring to the house analogy, the school board has the problem of erecting the new house on the lot at the same time it is tearing down the old. The practical contractor is going to look at the wrong structure to see which

portions of it fit the specifications for the proper structure and attempt to salvage these in the demolition process. In this respect the situation is like the school board's attempting to salvage and continue using the salvageable portions of the old system. But what is permissible for the contractor is not permissible for the school board because this salvage operation requires looking at the colors when taking the action. Of course the school board feels under a tremendous compulsion to do exactly this because its first and primary obligation, its reason for existence, is to provide an educational system.

33. Public Law 88-352, 88th Congress, 2nd Session, 78 Stat. 241, 42 USCA, Section 2000-C.

34. In this respect it is pertinent to note that generally the jurisdiction of all federal courts is subject to control by the Congress. Generally when the Congress determines a federal court has no jurisdiction to act in a particular manner with reference to a particular subject, the federal courts are bound by such determination (except as to such matters as the power of contempt which are necessarily embraced in the existence of a court). The Constitution of the United States, Article III, Sections 1 and 2.

35. The original bill (HR 7152) contained the following language:

> Sec. 303 (a). The Commissioner is authorized, upon the application of any school board, State, municipality, school district, or other governmental unit, to render technical assistance in the preparation, adoption, and implementation of plans for the desegregation of public schools *or other plans designed to deal with problems arising from racial imbalance in public school systems.* Such technical assistance may, among other activities, include making available to such agencies information regarding effective methods of coping with special educational problems occasioned by desegregation *or racial imbalance,* and making available to such agencies personnel of the Office of Education or other persons specially equipped to advise and assist them in coping with such problems.
>
> (b). The Commissioner is authorized to arrange, through grants or contracts, with institutions of higher education for the operation of short-term or regular session institutes for special training designed to improve the ability of teachers, supervisors, counselors, and other elementary or secondary school personnel to deal effectively with special educational problems occasioned by desegregation *or measures to adjust racial imbalance* in public school systems. Individuals who attend such an institute may be paid stipends for the period of their attendance at such institute in amounts specified by the Commissioner in regulations, including allowances for dependents and including allowances for travel to attend such institute.
>
> Sec. 304 (a). A school board which has failed to achieve desegregation in all public schools within its jurisdiction, *or a school board which is confronted with problems arising from racial imbalance in the public schools within its jurisdiction,* may apply to the Commissioner, either directly or through another governmental unit, for a grant or loan, as hereinafter provided, for the purpose of aiding such school board in carrying out desegregation *or in dealing with problems of racial imbalance.*
>
> (b). The Commissioner may make a grant under this section, upon application therefor, for —
>
>> (1) the cost of giving to teachers and other school personnel inservice training in dealing with problems incident to desegregation *or racial imbalance in public schools;* and
>>
>> (2) the cost of employing specialists in problems incident to desegregation *or racial imbalance* and of providing other assistance to develop understanding of these problems by parents, school children, and the general public.
>
> (c) Each application made for a grant under this section shall provide such detailed information and be in such form as the Commissioner may require. Each grant under this section shall be made in such amounts and on such terms and conditions as the Commissioner shall prescribe, which may include a condition that the applicant expend certain of its own funds in specified amounts for the purpose for which the grant is made. In determining whether to make a grant, and in fixing the amount thereof and the terms and conditions on which it will be made, the Commissioner shall take into consideration the amount available for grants under this section and the other applications which are pending before him; the financial condition of the applicant and the other resources available to it; the nature, extent, and gravity of its problems incident to desegregation *or racial imbalance,* and other such factors as he finds relevant.

36. Civil rights-hearings before Subcom. 5 of the Committee on the Judiciary, House of Repres., 88th Congress, 1st Session, Pgs. 1782, 1888-1889, 2084-2086, 2138, 2163 2234-2236.

37. House Report 914, Part 2, 88th Congress, 1st Session, (1963), pages 23 through 24.

38. I am especially indebted to Congressman Cramer's superb intervenor's brief for a clear presentation of the legislative history of the portions of the Civil Rights Act with which we are concerned in this suit.

39. Section 401(b) says: " 'Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance." In explaining the need for and meaning of his amendment, the Florida lawmaker declared:

> Mr. Chairman, this amendment is very simple. *It does precisely and unequivocally what the proponents of the bill indicate they wanted to do. That is, to strike "racial imbalance" from the bill* and from this title which I otherwise, in its present form, believe is still in the bill as I have said before many times.
>
> In the hearings before the committee I raised questions on "racial imbalance" and in the subcommittee we had lengthy discussions in reference to having these words stricken in the title, as it then consisted, and to strike out the words "racial imbalance" proposed by the administration.
>
> *The purpose is to prevent any semblance of congressional acceptance or approval . . . to include in the definition of "desegregation" any balancing of school attendance by moving students across school district lines to level off percentages where one race outweighs another.*

The Cramer amendment was thereafter unanimously adopted by the House. 110 Cong. Rec. 2197 (daily ed. Feb. 6, 1964), page 2280 permanent edition.

40. No better elucidation of this can be found than in the amplifying remarks of then Majority Whip Hubert Humphrey speaking for the managers of the bill (110 Cong. Rec. Page 12717, June 4, 1964):

> Next, changes are made to resolve doubts that have been expressed about the impact of the bill on the problem of correcting alleged *racial imbalance* in public schools. *The version enacted by the House was not intended to permit the Attorney General to bring suits to correct such a situation,* and indeed, said as much in section 401(b). However, *to make this doubly clear, two amendments* dealing with this matter are *proposed*.
>
> The first provides that nothing in Title IV "shall empower any court" or official of the United States to issue "any order" seeking to achieve "a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance or otherwise enlarge the existing power of the court to insure compliance with constitutional standards." *This addition seeks simply to preclude an inference that the title confers new authority to deal with "racial imbalance" in schools, and should serve to soothe fears that Title IV might be read to empower the Federal Government to order the busing of children around a city in order to achieve a certain racial balance or mix in schools.*
>
> *Furthermore, a new section 410 would explicitly declare that "nothing in this title shall prohibit classification for reasons other than race, color, religion, or national origin."*
>
> *Thus classification along bona fide neighborhood school lines, or for any other legitimate reason which local school boards might see fit to adopt, would not be affected by Title IV, so long as such classification was bona fide. Furthermore, this amendment makes clear that the only Federal intervention in local schools will be for the purpose of preventing denial of equal protection of the laws.*

Senator Javits of New York, a staunch proponent of civil rights, likewise sought to reinforce these understandings (110 Cong. Rec., June 4, 1964, page 12714):

> Taking the case of the schools to which the Senator is referring, and the danger of envisaging the rule or regulation relating to racial imbalance, it is negated expressly in the bill . . . Therefore *there is no case in which the thrust of the statute* under which the money *would be given would be directed toward . . . bringing about a racial balance in the schools.* If such a rule were adopted or promulgated by a bureaucrat, and approved by the President, the Senator's State would have an open and shut case under Section 603. That is why we have provided for judicial review. The Senator knows as a lawyer that we never can stop anyone from suing, nor stop any Government official from making a fool of himself, or from trying to do something that he has no right to do . . .

From the foregoing, it is evident that the Senate was fully cognizant of the ambitions of some "courts" and "officials" to enlarge the legislative plan from one aimed at ending segregation to one seeking to end so-called racial isolation by compelling racial balance in the nation's public schools. Witness the following exchange between Senator Robert Byrd of West Virginia and Senator Humphrey (110 Cong. Rec. 12289, 12291 (daily ed., June 4, 1964), pgs. 12715, 12717 perm. edition):

> *Mr. Byrd of West Virginia.* Can the Senator from Minnesota assure the Senator from West Virginia that under Title IV school children may not be bused from one end of the community to another end of the community at the taxpayers' expense to relieve socalled racial imbalance in the schools?
>
> *Mr. Humphrey.* I do.
>
> *(Mr. Humphrey) The Constitution prohibits segregation, it does not require integration. The busing of children to achieve racial balance would be an act to effect the integration of schools. In fact, if the bill were to compel it, it would be a violation, because it would be handling the matter on the basis of race and we would be transporting children because of race.* The bill *does not attempt to integrate* the schools, but it does attempt to eliminate segregation in the school systems. *The natural factors such as density of population, and the distance that students would have to travel are considered legitimate means to determine the validity of a school district, if the school districts are not gerrymandered, and in effect deliberately segregated. The fact that there is a racial imbalance per se is not something which is unconstitutional.*

41. 82 C.J.S., *Statutes* §327, and 50 Am.Jur., *Statutes* §242; see cases cited.

42. Article III, Section 2: "The judicial power shall extend to all cases, in law and equity, arising under this Constitution . . ."

43. Although not expressly applying to this court, since this is an exercise of a delegated power of the Fourteenth Amendment, under the supremacy clause (Article VI, paragraph two, United States Constitution) this court is also bound.

44. Florida Statutes, §228.13 —

> The public schools of the state shall provide thirteen consecutive years of instruction beginning with kindergarten and shall also provide such instruction for exceptional children as may be provided by law. Public schools, institutions and agencies providing this instruction shall constitute the *uniform system of public free schools prescribed by* Article IX of *the state constitution* and shall include the following:
>
> \* \* \*
>
> (2) ELEMENTARY SCHOOLS — Elementary schools shall comprise all classes and grades through the sixth grade or, upon decision by the school board when authorized by regulations of the state board of education, may include work through the eighth grade.

Florida Statutes, §230.23 —

> The school board, acting as a board, shall exercise all powers and perform all duties listed below:
>
> \* \* \*
>
> (4)(e) *Classification and standardization of schools* — Adopt plans and regulations for determining those school centers at which work is to be restricted to the elementary grades, school centers at which work is to be offered only in the high school grades, and school centers at which work is to be offered in any or all grades, and in accordance with such plans and regulations to determine the grade or grades in which work is to be offered at each school center; approve standards and regulations for classifying and standardizing the various schools of the district on such basis as to furnish incentive for the improvement of all schools.
>
> \* \* \*
>
> (8) TRANSPORTATION OF PUPILS — After considering recommendations of the superintendent to make provision for the transportation of pupils to the public schools or school activities they are required or expected to attend; authorize transportation routes arranged efficiently and economically; *provide the necessary transportation facilities,* and, when authorized under regulations of the state board and if more economical to do so, provide limited subsistence in lieu thereof; and adopt the necessary rules and regulations to insure safety, economy, and efficiency in the operation of all buses, as prescribed in chapter 234.

Florida Statutes, §234.01 —

*Purpose* — School boards, after considering recommendations of the superintendent and any suggestions which may have been submitted by trustees of the district shall provide transportation for each pupil who should attend a public school *when and only when transportation is necessary for accomplishment of one of the following purposes:* to provide adequate educational facilities and opportunities which otherwise would not be available; to transport pupils whose homes are more than a reasonable walking distance, as defined by regulations of the state board, *from the nearest appropriate school;* provided, that no state funds shall be paid for the transportation of pupils whose homes are within two miles *from the nearest appropriate school;* . . .

Regulations of the State Board of Education, which, if consistent with law, have the effect of law (Sections 229.041 and 120.041(4), Florida Statutes, Section 2A-1.08(6), Florida Administrative Code).

Rule 130-3.01(1)(a) says: "The chief purpose of transportation of pupils at public expense to the public schools of the state is to assist in providing adequate educational opportunities for children of school age within the limits established by law."

Rule 130-3.10(1) says: "Pupils eligible for transportation under the minimum foundation program are *those transported at public expense to the nearest appropriate school* as approved by the county board, upon recommendation of the county superintendent; provided, that insofar as practicable, arrangements shall be made for transportation of pupils to permanent school centers, including high schools and elementary schools with an attendance of 120 or more pupils, or to schools which are classed as isolated schools under regulations of the State Board of Education. *The nearest appropriate school* for transported pupils *shall be a* public kindergarten, *elementary,* junior or senior high *school located within an attendance area,* as determined by the county board, in which the pupil resides."

Rule 130-3.10(3) says: *"No student,* unless physically handicapped, who lives within two (2) miles of the school by the nearest traveled route or *who is transported from the attendance area of one such school to another school may be included as a transported pupil* in any allocation made under the minimum foundation program *unless* such pupil is granted permission under the regulations of the county board or junior college board of trustees to attend another school *to take special courses* not available at the school or education center serving the attendance area or district in which the student resides."

Rule 130-0.179 says: "Guidelines for a unitary school system. In those instances where district school boards are required by courts of competent jurisdiction to establish a 'unitary school system' and such courts do not define the term 'unitary school system,' such district school boards shall proceed to establish a 'unitary school system' within which no person is to be effectively excluded from any school because of race or color in accordance with the following guidelines:

1. A geographic school zone shall be established for each school within the school district.

2. Except as hereinafter provided, attendance at each school shall be limited to pupils residing within the geographical boundaries of the zone as established.

3. In establishing the boundaries of such zones all reasonable attempts shall be made to insure that both the black and the white races are fairly represented among the pupil population of each school.

4. In no case shall the school board, in establishing such zones, purposely delineate such zones so as to intentionally cause the existence of racially identifiable schools.

5. Each school district shall permit a student attending a school in which his race is in the majority to choose to attend another school, where space is available and where his race is in the minority.

6. There shall be no duty on the part of the board to bus black or white children out of the school zones of their residence for the sole purpose of alleviating racial imbalance that the school board did not purposely cause.

Rule 130-0.180 says: "Admission and assignment of students in a unitary school system.

(1) No person shall be refused admission into or be excluded from any public school in this state on account of race, creed, color or national origin.

(2) Except with the express approval of the applicable District School Board, no student shall be assigned to or compelled to attend any public school on account of race, creed, color or national origin or for the purposes of achieving equality in attendance or increased attendance or reduced attendance, at any school, of persons of one or more race, creed, color or national origin; and no school, district, school zone or attendance unit by whatever name known shall be established, reorganized or maintained for any such purpose; provided that nothing contained in this or any other regulation shall prevent the assignment of a pupil in the manner authorized by Section 230.232, Florida Statutes.

(3) The State Board of Education reaffirms its definition of a Unitary School System and continues the authority for the General Counsel to intervene in the county cases in which he can be of assistance in making clear to the courts the position of the State Board of Education on this issue.

Chapter 70-95, Laws of Florida, Section 30 —

No moneys appropriated in this act or by any county shall be used, directly or indirectly, to assign, transport or compel attendance of any student to any school based solely upon considerations of race, creed, color, or national origin, or for the purpose of achieving equality in attendance or increased attendance or reduced attendance at any school at which persons of one or more particular races, creeds, colors or national origins are enrolled.

45. Section 230.23(4)(e) must be read in pari materia with Florida Statute 228.13. When read together, it is obvious the legislature did not intend to rule out the constitutionally mandated uniform system prescribed by Section 228.13, but intended merely to allow the board discretion in determining what courses may be required or offered in each of the schools created pursuant to Sections 230.03 and 228.13. Within the framework established by Section 228.13, the board may determine which elementary schools will have music courses, French courses and other matters of this nature. To interpret Section 230.23(4)(e) as authority for the creation of elementary schools with grades one through four and different elementary schools with grades one through six or any one grade would eliminate the uniform system of free public schools required by the Constitution and require this court to declare Section 230.23 (4)(e) unconstitutional.

46. 28 U.S.C. §2281, et seq. I disagree with the reasoning and result in Swann v. Charlotte-Mecklenburg Board of Education, 312 F.Supp. 503 (April, 1970), which held a similar state statute unconstitutional.

47. The plan in this case is a so-called clustering plan. The only difference between "clustering" and "pairing" is that pairing involves two schools and clustering involves more than two schools. Also, re-drawing of zone lines will not work. It is necessary to look to results to determine that a school has been in fact desegregated. If you re-draw the zone lines, look at the result and find it is insufficient; then re-draw the zone lines, look at the result and find it is insufficient; then re-draw the zone lines, look at the result and find it is insufficient; and then re-draw the zone lines, look at the result and find it is sufficient, you may as well have looked at the colors of the people in advance. Actually that is what would be and is being done in re-drawing zone lines to accomplish desegregation. As has been stated in this opinion several times, we may not do indirectly what we cannot do directly.

In Swann v. Charlotte-Mecklenburg Board of Education, 312 F.Supp. 503, the court said: ". . . because any method of school desegregation involves selection of zones and transfer and assignment of pupils by race, a flat prohibition against racial 'balance' violates the equal protection clause of the Fourteenth Amendment." The only portion of this I agree with is that any method except simply eliminating the segregated system requires looking at race or color.

In this particular case eliminating the segregated school probably would not have as great an adverse educational and sociological impact as in probably most situations. In most situations the application of the Constitution to the court-imposed duty to desegregate resulting in the elimination of the neighborhood school in many black communities will have a severe, adverse sociological effect. Should the Supreme Court reconsider and reverse itself as to this improperly-imposed duty to desegregate, in time desegregation will come about through the operation of unitary school systems without disruption of black communities and mores.